**STATE of Missouri, Respondent,**

v.

**Garth Wayne DUCKETT, Appellant.**

**Garth Wayne DUCKETT, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. 16395, 18037.**

Missouri Court of Appeals,
Southern District,
Division One.

March 17, 1993.

CROW, Presiding Judge.

After his first trial ended in a deadlocked jury, Garth Wayne Duckett ("Appellant") was tried anew and found guilty by a jury of the class A felony of assault in the first degree, § 565.050.[1] The trial court found Appellant to be a prior offender, § 558.016.2, and a persistent offender, § 558.016.3, and imposed a 30-year sentence. Appellant brings appeal 16395 from that judgment.

While appeal 16395 was pending, Appellant commenced a proceeding per Rule 29.15[2] to vacate the judgment. After an evidentiary hearing, the motion court entered findings of fact, conclusions of law, and an order denying relief. Appellant brings appeal 18037 from that order.

We consolidated the appeals, Rule 29.15(*1*), but address them separately in this opinion.

### Appeal 16395

Appellant presents two points relied on; the first avers the trial court erred in denying Appellant's request for a mistrial after a comment by a venire member during voir dire; the second asserts the trial court erred in denying Appellant's motion for new trial in that the guilty verdict resulted from perjured testimony by the victim.

Because the sufficiency of the evidence to support the verdict is unchallenged, we set forth only the evidence pertinent to Appellant's claims of error.

The victim was Gregory Wade Fosdick. On May 11, 1988, he was near Kellogg Lake in Jasper County. Several others were there, including Harry Spry and Appellant.

Fosdick testified he walked past Appellant, and shortly afterward "felt something hit me in my back." Fosdick continued:

... I turned around immediately and Garth ... had his hand behind his back and he just stood there with a sneer on his face, patting his foot ... and I—what

Judith C. LaRose, Columbia, for appellant.

William L. Webster, Atty. Gen., Aundreia R. Alexander, Asst. Atty. Gen., Jefferson City, for respondent.

---

1. References to statutes are to RSMo 1986.

2. Rule references are to Missouri Rules of Criminal Procedure (20th ed. 1989).

**302**

are you doing? Why did you hit me? He didn't say nothing. I said you better explain yourself to me ... he didn't say nothing and I said you better defend yourself and I started to go to him and I took two steps and I felt something real bad and I reached around there and my finger went in a hole and just blood pouring out on me, and I said you son of a bitch, you stuck me and he said, "That's right motherf_____, and I'm going to kill you," and he swung at my face with that knife again and I got out of the way and took off running....

Fosdick made his way to the home of an acquaintance; from there he was taken by ambulance to a hospital. A surgeon determined Fosdick had sustained a knife wound in his abdomen; his liver was lacerated. Following emergency surgery, Fosdick was hospitalized seven days.

During voir dire, the prosecutor was asking whether the venire knew possible witnesses. This exchange occurred:

Mr. Crandall[3]: Harry Spry, I know Harry has been in Carthage for a number of years, I suspect he is a lifetime resident, anyone know Harry?

Venireman Cole: Yes.

Mr. Crandall: Mrs. Cole?

Venireman Cole: I do not know Harry, but I know his ex-wife and she and I are really good friends.

Mr. Crandall: Anything about your acquaintanceship with his ex-wife that would cause you to have a problem assessing all of the evidence as it may come from this witness stand here today?

Venireman Cole: I would have a problem believing anything that Harry said.

The Court: I couldn't hear the answer.

Venireman Cole: I would have a problem with anything that Harry Spry said.

The Court: Okay, Mrs. Cole, Miss Cole you are excused for cause. Thank you.

As Ms. Cole departed, a bench conference took place. The transcript shows:

Mr. Zuzul[4]: I move for a mistrial at this point.

The Court: Why is that?

Mr. Zuzul: Your Honor, Mr. Spry is a pretty important witness and I think this juror has probably contaminated the rest of the jury panel against him.

The Court: Motion for mistrial is denied.

Appellant presented Spry as a defense witness. Spry testified he saw Fosdick turn to Appellant and say, "Did you hit me Garth?" Spry denied seeing Appellant strike Fosdick. Spry added, "Everybody down there heard it, but nobody seen it." Spry avowed he "didn't see no blood or nothing."

Spry's direct and cross-examination revealed the following convictions: 1968, "first degree armed robbery," for which he "served seven years"; 1978, felony car tampering; 1984, felony stealing; 1986, "the felony of interference with custody of a child"; and "driving while revoked." Spry acknowledged Appellant had lived with him "for periods of time," and that he (Spry) had been drinking beer and whiskey "all day" on the date of the stabbing.

Appellant, testifying in his own defense, swore he neither hit nor stabbed Fosdick.

Appellant's first point maintains the comments by venire member Cole about Harry Spry tainted the entire venire and neither the trial court nor counsel "tried to rehabilitate the remaining panel of prospective jurors."

The law pertinent to Appellant's first point appears in *State v. Evans*, 802 S.W.2d 507 (Mo. banc 1991). There, the accused was charged with raping a nine-year-old girl. During voir dire, a venireman said, "Everybody's got some kind of thoughts, what he did to this nine year old girl." The accused's challenge for cause was granted, and the venireman was excused. The accused then moved to quash the entire venire, or alternatively for a mistrial. Both motions were denied but, at the accused's request, the trial court in-

---

3. Assistant prosecuting attorney.

4. Appellant's lawyer, Joe Zuzul, an assistant public defender.

structed the venire that anything said by a juror does not constitute evidence. *Id.* at 514. On appeal, the Supreme Court of Missouri explained:

> The trial court has broad discretion in determining if a jury panel should be dismissed and its ruling should not be disturbed on appeal absent a clear abuse of discretion. *State v. Cotton,* 724 S.W.2d 649, 652 (Mo.App.1986). Usually, disqualification of an individual juror for bias or expression of an opinion is insufficient for challenging the entire array. *State v. Weidlich,* 269 S.W.2d 69, 71 (Mo.1954). To merit quashal, movant must demonstrate that the venireman's questionable responses were so inflammatory and prejudicial that it can be said a right to a fair trial has been infringed. *State v. Harrell,* 637 S.W.2d 752, 757 (Mo.App.1982).... In ... *Weidlich,* ... a venireman stated during voir dire, "I don't think I can give a thief a fair trial" and he was stricken from the panel. The trial judge admonished the remaining members to disregard comments made by one of their number as such was not evidence and ... this Court found no abuse of discretion. [269 S.W.2d] at 71.
>
> In the present case [the venireman] was stricken and the trial judge instructed the panel to disregard his comments. The lone remark was not such as to inflame or prejudice the other prospective jurors and we find no abuse of discretion in refusing [the accused's] motion to quash or for a mistrial.

802 S.W.2d at 514–15[17–19].

In arguing the trial court committed reversible error by denying the motion for mistrial, Appellant points out that in *Evans* and *Weidlich* (*Weidlich* is discussed in the excerpt from *Evans,* above) the trial court admonished the venire to disregard the depreciatory comments. Here, that was not done. Consequently, says Appellant, we cannot assume the jurors disregarded Ms. Cole's comments "on their own volition."

■ Appellant did not ask the trial court to direct the jury to disregard Ms. Cole's remarks, hence any error by the trial court in failing to do so has not been preserved for review. *Cf. State v. Cummings,* 765 S.W.2d 366, 369[4] (Mo.App.1989). *See also: State v. Cheatham,* 340 S.W.2d 16, 20[11] (Mo.1960).

■ Furthermore, when the motion for mistrial was denied, Appellant's lawyer may have concluded it was better strategy to proceed without the trial court focusing the venire's attention on Ms. Cole's comments by an admonition to disregard them.

More importantly, however, Spry's criminal pedigree blighted his credibility far more than Ms. Cole's responses. In view of Spry's past crimes, his drinking on the date of the stabbing, and his relationship with Appellant, the effect, if any, of Ms. Cole's comments on Spry's credibility was negligible.

As explained in *Evans,* 802 S.W.2d at 514, a venire should be quashed only if one of its members says something so inflammatory and prejudicial that the accused's right to a fair trial is infringed. Because of what the jury learned about Spry during trial, Ms. Cole's expression of skepticism about his credibility became inconsequential and did not undermine Appellant's right to a fair trial. His first point is denied.

■ Appellant's second point is based on an incident that allegedly occurred hours after the verdict. Evidence about it was presented during the hearing on Appellant's motion for new trial.

Billy Joe Lesher testified he was lodged on the west side of the Jasper County Jail the day Appellant was tried. Around "dusk," said Lesher, he heard a voice outside. Through an open window, Lesher saw Fosdick "standing in the parking lot across from the jail." Lesher did not recall seeing anyone with Fosdick. Asked what he heard Fosdick say, Lesher answered:

> I heard him saying that he was on the stand and he was lying. And whenever Garth was on the stand, he was telling the truth. And the whole thing was just a big blowover and Garth got convicted and it wasn't his fault. And he knew it wasn't his fault.

Lesher revealed he had pled guilty to one "*bad check*" felony and had two misdemeanor check convictions. On the date of Appellant's trial, Lesher and Appellant had been cellmates 30 days.

Joseph Eugene Paugh, another jail inmate, testified he saw Fosdick outside the jail the night of Appellant's trial. Paugh's version was:

> We all went to the window, and Fosdick was standing right in front of the bar out in the middle of the street saying how—I don't remember his exact words exactly, but he was saying how does it feel to be going up the river for the rest of your life for something that you did not do, and I got up there and the courts believed me over you and that I was lying, you know, that you was telling the truth, something like that.
>
> Q. How long did this go on?
>
> A. I'd say for about 30 minutes. And he came in and out of the bar, he would go in and get him a beer. He would come out in the middle of the street with a beer in his hand while he was saying that.
>
> . . . .
>
> Q. How many times was that said?
>
> A. That was said probably once then at that time, until he went back in the bar. Then—I believe it was said once, and then he came back out of the bar laughing and poking fun at Duckett again about it, not saying the exact words that, you know, the second time, but he was laughing. He had a can of beer in his hand and he said—you know, he just poked fun more or less at him.... There was two other guys out there with him.
>
> Q. There were two other guys with him?
>
> A. I believe, two or three other guys, and they was just all out there laughing, you know. And I believe they was talking about—to the best I can imagine, the guys was asking him if that was Duckett at the window that he was talking about, and Fosdick was saying yes....

> . . . .
>
> Q. ... on the first occasion when you first heard him calling, was anyone with him?
>
> A. There was two or three guys there standing with him.

Paugh disclosed he had earlier pled guilty to auto theft, but had been allowed to withdraw the plea and was awaiting trial. He had a misdemeanor stealing conviction. At the time of the hearing on Appellant's motion for new trial, Paugh had been in jail some five months. Like Lesher, Paugh was a cellmate of Appellant.

Appellant's account of Fosdick's alleged behavior outside the jail on the night of the trial was:

> ... Greg Fosdick and another man with a beard and some other man, I'd say they was right about the same size, were in between a Jeep and another automobile. And Greg Fosdick was making statements about how does it feel to be going to the penitentiary for maybe the rest of your life for something you didn't do. And I sat up there and lied to the jury all day long and they believed everything I said and they didn't believe—and you told the truth and they didn't believe shit you said. His exact words.

Appellant added that Carthage police were called to get Fosdick "to shut his mouth."

Appellant's conviction record (disclosed during his testimony at trial) included: burglary and stealing, 1972, released from confinement in 1974; felony stealing, 1976, released from confinement in 1977; armed robbery, 1979, released from confinement in 1987; two "DWI's" and "lots of misdemeanors" including one or two common assaults.

Fosdick was also called as a witness at the hearing on Appellant's motion for new trial. He acknowledged he went to a bar "catty-corner" from the Jasper County Jail the night of the trial. He estimated the distance between the bar and jail at 300 feet. He denied approaching the jail, and avowed he "went right straight in the bar." Fosdick's testimony continued:

Q. Did you yell into the jail on the night of the trial words to the effect that the jury believed every lie that you told them and that they didn't believe anything that Garth told them?

A. Absolutely not.

At the conclusion of the evidence on Appellant's motion for new trial, the trial court denied it without comment. Appellant insists this was error in that the verdict "was a result of the perjured testimony of Gregory Fosdick." Implicit in that contention is the assumption that Fosdick admitted, outside the jail, that his testimony at trial about the stabbing was false.

The trial court was not obliged to believe the post-trial testimony of Lesher, Paugh and Appellant. The truth or falsity of their testimony was for the trial court to determine, in the exercise of sound judicial discretion. *State v. Palmer,* 726 S.W.2d 810, 812 (Mo.App.1987); *State v. Galardo,* 654 S.W.2d 360, 362 (Mo.App.1983).

There were marked differences among the versions of Lesher, Paugh and Appellant regarding Fosdick's alleged conduct outside the jail. Lesher said Fosdick was in a parking lot, alone. Paugh said Fosdick was in the middle of the street, accompanied by two or three "other guys," and shouted toward the jail on at least two separate occasions, going into the bar during the interval. Appellant said Fosdick and his companions were between a Jeep and another automobile, and police were summoned to quiet Fosdick.

If the trial court was not satisfied that the post-trial testimony of Lesher, Paugh and Appellant was true, it was the trial court's duty to deny a new trial. *Cf. State v. Harris,* 428 S.W.2d 497, 501 (Mo.1968). We assume from the trial court's ruling that it disbelieved such testimony.[5] We defer to the trial court's superior position from which to determine credibility. *State*

*v. Lytle,* 715 S.W.2d 910, 915[9] (Mo. banc 1986). Appellant's second point is denied.

### Appeal 18037

Appellant's third point—the only one pertinent to appeal 18037—avers the motion court erred in denying postconviction relief in that Appellant received ineffective assistance of counsel at the jury trial. Specifically, Appellant charges his lawyer was derelict in failing to present Linda Waisner[6] and Beth Elmore as witnesses "to testify that Harry Spry said he stabbed Fosdick, or to read [Waisner's] prior testimony into evidence in support of Appellant's defense that he did not stab Fosdick."

■ To prevail on a claim of ineffective assistance of counsel, a prisoner seeking postconviction relief must show (1) his lawyer failed to exercise the skill and diligence a reasonably competent lawyer would have exercised under similar circumstances, and (2) the prisoner was thereby prejudiced. *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987).

We first consider Appellant's complaint that his lawyer, Joe Zuzul,[7] failed to call Beth Elmore as a witness at trial.

Ms. Elmore testified for Appellant at the evidentiary hearing on his motion for postconviction relief. She avowed that while Fosdick was hospitalized, Harry Spry came to her house and told her, "Fosdick doesn't know who stabbed him, and just between me and you, I did it." Ms. Elmore recounted that before Appellant's first trial, she talked to Pat Knapp, an investigator for the Public Defender's office where lawyer Zuzul was employed when he represented Appellant. The conversation with Knapp occurred at Ms. Elmore's home. According to Ms. Elmore, she told Knapp about Spry's disclosure that he stabbed Fosdick.

---

5. During allocution, Appellant told the trial court: "... I will ... appeal ... and ... will be granted one. Then I myself will testify against the person guilty of ... the crime. I held back his identity in my first trial and the second one when I was asked by the Court if I saw the

person who stabbed Mr. Fosdick, I said no. I perjured myself there."

6. This name also appears as "Wasner" in the record.

7. Footnote 4, *supra.*

Ms. Elmore admitted she and Appellant had been "close friends" for 30 years and he had once stayed at her house "a couple of months." Ms. Elmore had two "bad check" convictions and an assault conviction, all misdemeanors.

Pat Knapp, called as a witness by the State in the motion court, recalled talking to Ms. Elmore November 1, 1988 (some five and a half months after the stabbing). He described Ms. Elmore's attitude as "very suspicious." Knapp's testimony continued:

> Q At any time during your interview of her, did she mention to you the fact that a Harry Spry had told her he had, in fact, stabbed Garth Duckett [sic]?
>
> A No. She kept telling me to talk to this Linda Waisner.

Lawyer Zuzul, called as a witness by the State in the motion court, testified he worked with Knapp in investigating the stabbing charge against Appellant. Zuzul swore he did not remember ever hearing the name Beth Elmore.

The motion court's findings included these:

> Knapp indicated Elmore ... never advised him Spry had told her Spry had actually committed the underlying crime, not [Appellant]. Introduced into evidence was the portion of Knapp's file containing Knapp's notes of his interview with Elmore. Knapp's interview notes revealed no mention by Elmore of the alleged conversation between Elmore and Spry.

The motion court held Appellant failed to demonstrate lawyer Zuzul rendered ineffective assistance.

Appellate review of the motion court's denial of postconviction relief is limited to a determination of whether the findings and conclusions of that court are clearly erroneous. Rule 29.15(j); *State v. Vinson*, 800 S.W.2d 444, 448 (Mo. banc 1990).

■ Failure to call a witness to testify is not ineffective assistance if counsel had no notice of the witness. *Sloan v. State*, 779 S.W.2d 580, 582 (Mo. banc 1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 776 (1990). Likewise, it is not inef-

fective assistance for counsel to fail to investigate witnesses whom he does not know exist. *Edwards v. State*, 772 S.W.2d 703, 704[2] (Mo.App.1989); *Manning–El v. State*, 740 S.W.2d 312, 313[2] (Mo.App. 1987).

■ It was Appellant's burden to prove his grounds for relief by a preponderance of the evidence. Rule 29.15(h); *Clemmons v. State*, 795 S.W.2d 414, 416[2] (Mo.App.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1689, 114 L.Ed.2d 83 (1991). The motion court was not obliged to believe Ms. Elmore's testimony that she told investigator Knapp that Spry had told her he stabbed Fosdick. Credibility of witnesses in a postconviction proceeding is for the motion court's determination. *State v. Tubbs*, 806 S.W.2d 746, 749[8] (Mo.App. 1991). The motion court can disbelieve testimony even where uncontradicted. *Gresham v. State*, 813 S.W.2d 120 (Mo.App. 1991). We defer to the motion court's determination of credibility. *Harry v. State*, 800 S.W.2d 111, 115[9] (Mo.App.1990).

Here, the motion court obviously found the testimony of Knapp and Zuzul credible, and Ms. Elmore's unconvincing. That was the motion court's prerogative. Consequently, the motion court's finding that Zuzul was innocent of ineffective assistance in failing to present Ms. Elmore as a witness at the jury trial is not clearly erroneous.

■ We next consider Appellant's complaint about lawyer Zuzul's failure to present Ms. Waisner as a witness at the jury trial or to read the jury her "prior testimony." In his motion court testimony, Zuzul was asked about that decision. His response:

> We called her at the first trial, mainly so she could testify that Spry admitted to her that Spry had stabbed Fosdick, to get in an inconsistent statement from Spry, who we'd also called. And my recollection is that she was such a bad witness, and got torn up so bad on cross-examination, that it was my opinion, and also Mr. Duckett's opinion,

that we shouldn't call her at the second trial.

Q You did, in fact, consult with Mr. Duckett regarding that?

A Yeah, we agreed on that.

Q That was a joint decision by you and Mr. Duckett not to call Linda Waisner as a witness at the second trial?

A Yes.

Appellant did not testify in the motion court, hence Zuzul's testimony was uncontradicted.

Furthermore, after imposing sentence on Appellant following the denial of his motion for new trial, the trial court examined Appellant as required by Rule 29.07(b)(4). That dialogue includes this:

Q. Did [Mr. Zuzul] do the things you asked him to do prior to and during the trial?

A. Yeah, he did everything I've asked him to do.

....

Q. Are you satisfied with the services rendered by Mr. Joe Zuzul as your attorney?

A. Yeah, I am.... I'm satisfied with the way he handled it, yes, sir.

....

Q. Are there any complaints that you want to make about him?

A. No, sir, he did a good job.

The motion court found:

In regard to Zuzul's failure to call Linda Waisner as a witness at the second trial, Zuzul indicated in his considered opinion Waisner had not been a credible witness in the first jury trial and he did not feel she would be a good witness in the second jury trial.

Strategic choices by counsel after thorough investigation of the law and facts are virtually unchallengeable. *State v. Twenter*, 818 S.W.2d 628, 635[10] (Mo. banc 1991). An accused's lawyer is afforded broad latitude as to questions of trial strategy, and is not to be judged ineffective constitutionally simply because in retrospect such a decision may seem an error in judgment. *State v. Davis*, 814 S.W.2d 593, 603[8] (Mo. banc 1991), *cert. denied*, ——

U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992).

Zuzul knew what to expect from Ms. Waisner, as he had represented Appellant at the earlier trial where she testified. Zuzul's decision not to put her on the witness stand was a strategic choice in which Appellant (according to Zuzul) concurred. Appellant registered no complaint about Zuzul's performance during the Rule 29.-07(b)(4) examination.

As we have seen, the motion court found Zuzul did not render ineffective assistance. That finding is not clearly erroneous.

The conviction of assault in the first degree is affirmed. The order denying post-conviction relief is affirmed.

PARRISH, C.J., and SHRUM, J., concur.