STATE of Missouri, Respondent,

v.

Santino J. GARNER, Appellant.

No. WD 53839.

Missouri Court of Appeals,
Western District.

Sept. 15, 1998.

Emmett D. Queener, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alana M. Barragan–Scott, Asst. Atty. Gen., Jefferson City, for respondent.

Before SMART, P.J., and ELLIS and HOWARD, JJ.

HOWARD, Judge.

Santino Garner appeals from convictions of robbery in the first degree, § 569.020, RSMo 1994, and armed criminal action, § 571.015, RSMo 1994. He contends that the trial court erred by failing to grant him a new trial on the basis of newly discovered evidence, and by overruling his challenge to the State's use of peremptory strikes to remove three black women from the jury panel.

Affirmed.

On the afternoon of February 22, 1996, Dennis Compos was standing beside his 1966 Chevrolet Bel Air, which was parked along Independence Avenue in Kansas City, Missouri. As Compos talked with a friend named Arthur Walker, a dark-colored Ford pulled up behind his car, blocking it in. One of the Ford's three occupants, whom Compos identified at trial as Garner, got out and said hello to Walker, and Compos concluded that the two were acquainted. Garner then asked Compos if he wanted to sell his Bel Air. When Compos declined, Garner returned to the Ford and Compos thought he was going to leave. Instead, Garner reapproached Compos as the Ford drove off, and stuck a gun in Compos' side. Compos testified at trial that he thought the weapon was some kind of sawed-off shotgun. Garner then got in Compos' car and drove off.

A short time later, Compos came across a police officer and told him of the carjacking. The officer broadcast a description of the stolen vehicle, which another officer then saw traveling westbound on 12th Street. As the officer followed the stolen vehicle, he could see the face of Garner, its sole occupant, in the Bel Air's rearview mirror, and the officer could tell that Garner was nervous. When the officer activated his lights and siren, the Bel Air accelerated, leading the officer on a chase at up to 60 miles per hour in a 35 miles per hour zone. Eventually, the Bel Air crashed into a retaining wall and telephone pole, and Garner got out and started running. Garner was apprehended on foot, and

three shotgun shells were found in his pants pocket.

Garner testified in his own defense at trial, and denied robbing Compos of his car. Garner claimed that, prior to the incident, he had agreed to sell Walker a set of four chrome wheels for $2,200.00. He stated that later he took the bus to meet Walker to finish the deal, and found Walker with Compos, whom he assumed to be the real buyer of the wheels. According to Garner, Compos wanted to buy the wheels, but didn't have the money at that time, so he gave Garner the car as collateral until he could acquire more funds. Garner claimed that Compos handed him the keys and he drove away.

Garner testified that he later attempted to elude the police because he knew there was an outstanding warrant for his arrest for a parole violation, and also because he was afraid that Compos might have given him a stolen car. Garner also claimed that he did not know how the police could have found shotgun shells in his pocket, as he didn't have any in his possession.

Garner was convicted of first-degree robbery and armed criminal action, and was sentenced as a prior and persistent offender to concurrent prison terms of twenty and ten years, respectively. Garner timely filed a motion for new trial, but the motion did not contain a claim based upon newly discovered evidence. It was not until the sentencing hearing, which took place about four months after Garner's trial, that such a claim was made.

At the sentencing hearing, Garner presented the testimony of Thomas Pace, who stated that, a month earlier, he had encountered Garner in jail while Garner was awaiting sentencing in this case and Pace was awaiting trial in an unrelated prosecution. Pace contended that his conversation with Garner had jogged his memory, and that he had recalled witnessing the encounter which led to Garner's taking possession of Compos' automobile.

Pace claimed that he was present with Compos and Walker when Garner walked up, and that he had stepped away from them as they talked. Nevertheless, he said, he could hear pieces of their conversation, and he described what he heard as follows:

Q. Okay. From the odds and ends that you did hear, what part of the conversations do you recall?

A. Like he asked, you know, did he have the money for his rims, cause—and I, you know, I'm not for sure, but Dennis, I know he bought some rims, but I don't know where exactly from who.

Q. Okay.

A. You know, but—did he have the money for some rims. And, I was, you know, referring to the rims on his car. So, then, you know, they talked like, "No, I don't have it but I could pay you later."

Q. Okay, did you hear anything else?

A. Uh, then they had a little conversation like, you know, kept on talking and he said that he needed, you know, some money now, you know, not all, just, you know, pay him little by little.

A. Who said that?

A. That's what he, you know—

Q. Who said that?

A. He was referring—Santino. He was like, in other words he said, you know, if he didn't pay him the full amount, he needed to pay him little by little.

Q. What did they say next?

A. And, then, they kept talking and the next thing you know, he got—they gave, he got into the car and they all, you know, went off their separate ways.

At the close of the hearing, the trial court denied Garner's claim for relief on the basis of newly discovered evidence. In so doing, the trial court noted that, after observing Pace's testimony, it found him to be without credibility as a witness. The court also determined that, since Pace's testimony was that he knew Garner from belonging to the same church years earlier, and that he was present at the time of the incident, Garner would have been aware of him, and in the exercise of diligence should have subpoenaed him to appear at trial.

In his first point on appeal, Garner claims that the trial court erred by failing to grant him a new trial on the basis of newly discov-

ered evidence. Garner acknowledges that his claim of newly discovered evidence was not raised in a timely fashion, and seeks review on the basis of plain error.

▆▆ Missouri procedures do not provide a means for a criminal defendant to present claims of newly discovered evidence to the judiciary after the time to file a Rule 29.11 motion for a new trial have expired. *State v. Young,* 943 S.W.2d 794, 799 (Mo.App. W.D. 1997). An untimely claim of newly discovered evidence preserves nothing for review, and, procedurally, is a nullity. *Id.* The only formally authorized means by which a criminal defendant with a late claim of newly discovered evidence can seek relief is by application to the governor for executive clemency or pardon. *Id.*

This court, however, has recognized that, in "extraordinary" cases, it may remand the case as plain error pursuant to Rule 30.20 or to this court's inherent powers so that the defendant can present his new evidence. *Id.* Such extraordinary circumstances are where the newly discovered evidence would have completely exonerated the defendant. *Id.*

▆▆ This is not the extraordinary kind of case which merits the relief that Garner is seeking. First, we note that the truth or falsity of Pace's testimony at Garner's hearing on his motion for new trial was for the trial court to determine in the exercise of its discretion, and if the trial court was not satisfied with Pace's post-trial testimony, it was the trial court's duty to deny a new trial. *State v. Duckett,* 849 S.W.2d 300, 305 (Mo. App. S.D.1993). We defer to the trial court's superior position from which to determine credibility. *Id.*

▆▆ Furthermore, we cannot conclude that, even if Pace's testimony had been credible, it would have completely exonerated the defendant, particularly given the fact that Garner was found with three shotgun shells in his pocket when he was apprehended after attempting to elude the police. New trials on the basis of newly discovered evidence are not favored, and the trial court is vested with substantial discretion in deciding whether such relief should be granted. *State v. Amrine,* 741 S.W.2d 665, 674 (Mo. banc 1987).

Considering both Pace's lack of credibility and the nature of the evidence against Garner, the trial court did not abuse its discretion in refusing relief in the case at bar.

In his second point on appeal, Garner claims that the trial court erred by overruling his challenge to the State's use of peremptory strikes to remove three black women from the jury panel. Garner contends that the State's proffered explanations for its strikes were pretextual and motivated by race.

Garner challenged, on the basis of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the removal of venirepersons Brantley, Caldwell, and Hill. The State's explanation for its peremptory strike of Brantley was that she had a brother who was incarcerated and, when asked if she had any opinion about whether he was treated fairly, she said "I'm not sure." In challenging the State's explanation, Garner noted that another venireperson, who was not struck by the State, had indicated that her cousin was incarcerated and, when asked the same question, she replied "I don't have any opinion about it one way or the other."

The State's explanation for its peremptory strike of Caldwell was that she had been the victim of an assault and she felt that law enforcement officials didn't do enough in pursuing her assailant. Garner's only challenge to this explanation was to assert that he perceived a pattern of removing minority members from the venire panel. The State explained that Hill was struck from the jury because of her youth, and noted that it had also struck several other female jurors because of their youth.

▆▆ Once a defendant raises a *Batson* challenge, the State is required to offer a race-neutral explanation for the strike. *State v. Roddy,* 963 S.W.2d 313, 316 (Mo. App. W.D.1997). The State's explanation need not be plausible or persuasive, and it is presumed to be race-neutral unless a discriminatory intent is inherent in the explanation. *Id.* Once the State offers its race-neutral explanation, the burden of production shifts back to the defendant to show that the proffered race-neutral explanation is pretex-

tual and that the strikes were racially motivated. *Id.*

 A trial court's findings on a *Batson* challenge are entitled to great deference because its decision depends largely on the evaluation of intangibles such as credibility and demeanor. *Id.* at 317. We will not set aside the court's findings unless they are clearly erroneous. *Id.* A finding is clearly erroneous if the reviewing court is left with the definite and firm conviction that a mistake has been made on the evaluation of the entire evidence. *Id.*

 In finding that the State's explanation for its peremptory strike of Brantley was not pretextual, the trial court noted that there is a distinction between a possible concern about the treatment of a brother and that of a cousin, with the situation of the closer relative having a greater potential to influence the juror. Also, we note that Brantley's response to the question was subtly different than that of the other juror. Brantley's response acknowledged that she might have a concern when the other juror responded that she definitely had no opinion whatsoever. We cannot conclude that the trial court's finding was clearly erroneous.

 Garner's challenge of the State's explanation for the peremptory strike of Caldwell was not based upon an analysis of the specific reason articulated by the prosecutor for Caldwell's removal, but instead merely charged that there seemed to be a pattern of removing minorities from the jury. If the defense fails to provide more than general or conclusory allegations to prove racial discrimination, the *Batson* challenge is not preserved for appeal. *State v. Watts,* 919 S.W.2d 287, 291 (Mo.App. W.D.1996). Such is the case here.

 The State also proffered a race-neutral explanation of its peremptory strike of Hill, namely that Hill was struck from the jury because of her youth, and that several other female jurors had also been struck because of their youth. On appeal, Garner notes that gender-based strikes are also improper, citing *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994). However, Garner did not make a gender-based challenge of the State's strikes during jury selection, and therefore, to the extent he raises such an argument in his brief, it is not preserved for review. *State v. Jackson,* 948 S.W.2d 138, 141 (Mo. App. E.D.1997).

The judgment of the trial court is affirmed.

All concur.