# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2259

_____

| | | |
|---|---|---|
| Darryl Burton, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| David Dormire, Jeremiah Nixon, | * | [TO BE PUBLISHED] |
| | * | |
| Appellees. | * | |

_____

Submitted: May 16, 2002
Filed: July 8, 2002

_____

Before BOWMAN, MAGILL and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

The writ of habeas corpus balances the constitutional imperative of a fair criminal trial with respect for state court judgments and the finality thereby achieved for victims of crime and society at large. The writ serves as a "bulwark against convictions that violate fundamental fairness," Engle v. Isaac, 456 U.S. 107, 126 (1982) (quotation omitted), by providing "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty." Stone v. Powell, 428 U.S. 465, 491 n.31 (1976). At the same time, however, "[l]iberal allowance of the writ . . . degrades the prominence of the trial itself," Engle, 456 U.S. at 127, and complicates our unique system of federalism, Williams v. Taylor, 529 U.S. 420, 436-

37 (2000). Accommodating these frequently opposing principles has long produced controversy.

Debate has intensified in recent years as Congress and the federal courts have limited access to the writ in reaction to increasing numbers of habeas petitions. The limitations include a confounding array of procedural impediments that prevent consideration of the merits of claims, as well as substantive barriers that establish modes of review utterly inhospitable to prisoners. Many barriers and impediments represent sound efforts to curb the groundswell of frivolous and duplicative habeas petitions. But the writ of habeas corpus is not a one-way path designed to defeat prisoners' claims. Rather, our habeas jurisprudence is a balancing act requiring careful attention to each of the important, yet often opposing, principles at stake. Even as we screen meritless petitions, therefore, we must take care not to shut the door to prisoners whose claims cause us to doubt the fairness of their convictions.

The present case suggests we may not yet have achieved the optimal balance. Darryl Burton's habeas petition depicts a troubling scenario. One cannot read the record in this case without developing a nagging suspicion that the wrong man may have been convicted of capital murder and armed criminal action in a Missouri courtroom. Burton was convicted on the strength of two eyewitness accounts. Since his trial and imprisonment, new evidence has come to light that shakes the limbs of the prosecution's case. One eyewitness has recanted and admitted perjury. The other eyewitness's veracity has been questioned by a compatriot who avers it was physically impossible for him to have seen the crime. A layperson would have little trouble concluding Burton should be permitted to present his evidence of innocence in *some* forum. Unfortunately, Burton's claims and evidence run headlong into the thicket of impediments erected by courts and by Congress. Burton's legal claims permit him no relief, even as the facts suggest he may well be innocent. Mindful of our obligation to apply the law, but with no small degree of reluctance, we deny Burton a writ.

# I

Donald Ball was murdered at an Amoco gas station in St. Louis on the night of June 4, 1984. A gunman ran up to Ball as he filled his gas tank. The gunman chased Ball across the station lot and shot him several times. Police eventually arrested Burton and the state charged him with capital murder and armed criminal action. The state was unable to procure physical evidence implicating Burton, but it produced two eyewitnesses, Claudex Simmons and Eddie Walker, to testify that Burton was the gunman.

Simmons said he had been standing in line to buy cigarettes at the Amoco station when the shooting took place. He told the jury he knew Burton and had seen him shoot Ball. He also testified Burton ran north off the Amoco lot after the shooting. But Simmons's trial testimony was inconsistent with his statements to police during the murder investigation. Simmons had initially told police he did not see the shooter. And in one pretrial interview, Simmons told police he was exiting a liquor store next to the Amoco station when he heard shots and saw the shooter.

The state had obtained Simmons's testimony at trial by reaching a plea bargain with him on an attempted robbery charge. Simmons told the jury he would receive a one-year sentence on the robbery charge if he testified truthfully at Burton's trial, and a three-year sentence if he lied or refused to testify. Burton alleges Simmons also received a *second* plea bargain for an unrelated stealing felony, but told neither the jury nor Burton the terms of that deal. Burton claims the second plea bargain was entered to secure Simmons's testimony against him at trial, though there is scant evidence in the record to confirm Burton's suspicions.

The second eyewitness was Eddie Walker. After the shooting, Walker told officers he was standing on the Amoco lot when Ball drove up to buy gas. He saw a gunman walk onto the station lot from the south side and shoot Ball. Walker also

told police the gunman ran south after shooting Ball (not north, as Simmons stated) and sped away in a blue Buick. Walker said he had known both Burton and Ball for roughly ten years and could identify Burton as the gunman from photographs.

Walker told the jury a different story than he told officers, however. Walker testified he had never seen Ball drive up to the Amoco station in the first place. Likewise, he did not see the gunman approach, because he had been drinking from a half-pint of gin or vodka with friends next to the side of the nearby liquor store when the first shot rang out. Hearing that shot, Walker claimed he turned and saw Burton shoot Ball again, then run east across the street, before circling back and ending up on the south side of the Amoco lot. Walker also testified Burton had not sped from the scene in a Buick.

The state's only significant evidence of Burton's guilt was the eyewitness testimony of Simmons and Walker, though the state offered some proof of motive. Ball's first cousin, Cynthia Whitfield, told a police officer after the shooting that Ball and Burton had been feuding before the murder. According to Whitfield, Ball's girlfriend (who was apparently a prostitute) had left him and taken up with Burton. Whitfield's account was undermined, however, because she identified a third man as her cousin's murderer, and because Ball's girlfriend later denied any feud between Ball and Burton.

A jury convicted Burton of capital murder and armed criminal action in March 1985. A Missouri circuit judge then imposed consecutive sentences of 25 and 50 years without the possibility of parole. After Burton had been convicted and imprisoned, new counsel reinvestigated the crime scene and the eyewitnesses with the help of investigators. They obtained a variety of affidavits that undercut the force of Simmons's and Walker's eyewitness testimony.

Five months after trial, while serving his own prison sentence, Simmons recanted his testimony implicating Burton in the murder: "I submitted perjury testimony [sic] to gain immunity, from the herein-mentioned murder of one Donald Ball." App. 646. Burton later obtained several affidavits from Simmons's acquaintances asserting Simmons had admitted his perjury to them, or had expressed ill feelings toward Burton.

Investigators could not interview Walker, who died in November 1996, but Burton's investigators tracked down one of Walker's friends, Daniel Pennington. Pennington said he had been drinking with Walker outside another friend's house near the Amoco station at the time of Ball's murder.

> If Eddie Walker said that he saw the shooting and could identify the shooter that night, he was lying. It is physically impossible for any of us to see the [Amoco] lot and the area of the shooting from where we were standing.

App. 82. Pennington and other affiants claimed Walker was a notorious liar. And one woman even asserted Walker had poor eyesight and never wore his glasses while drinking.

Apart from building a case against the two eyewitnesses, Burton's investigators also attempted to exonerate Burton directly. Investigators located Jennifer Shaw, a woman present at the Amoco station when the shooting occurred. Shaw told investigators she knew Burton and had seen the shooting, but she did not know the identity of the shooter. Shaw said she would have testified at trial if she had been contacted. Investigators also developed evidence suggesting the gunman was a man named Jesse Watson, who is now deceased. Watson had allegedly been feuding with Ball and had vowed to kill him.

Much of this evidence was developed during, or after, Burton exhausted his state-law remedies in preparation for seeking a writ of habeas corpus in federal court. Some of Burton's arguments were therefore defaulted because he failed to raise them in timely fashion. It must also be acknowledged that some portion of this evidence is likely inadmissible hearsay.

Burton filed a habeas petition raising 16 claims in federal court in April 1997. The district court[1] considered the variety of different claims and denied every one of them on three separate occasions: once in the original petition, again in a Fed. R. Civ. P. 59(e) motion, and finally in a Fed. R. Civ. P. 60(b) motion. Despite rejecting Burton's claims, the district court was eventually persuaded to grant Burton a certificate of appealability on four issues, and an administrative panel of our court later expanded that certificate by two issues. See 28 U.S.C. § 2253(c).

II

We turn now to a discussion of these six issues, bearing in mind that we may not grant a writ unless the state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Each of the issues certified for our review presents a question arising under the "unreasonable application" clause, rather than the "contrary to" clause, so we must determine whether the state court unreasonably applied governing legal principles from Supreme Court cases. Williams v. Taylor, 529 U.S. 362, 407-411 (2000) (O'Connor, J., writing for the Court). The Court "stressed in Williams that an unreasonable application is different from an incorrect one." Bell v. Cone, 122 S. Ct.

_____

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

1843, 1850 (2002). For this reason, "[w]e must deny a writ—even if we disagree with the state court's decision—so long as that decision is reasonable in view of all the circumstances." May v. Iowa, 251 F.3d 713, 716 (8th Cir. 2001).

A

Burton contends his trial lawyer violated his Sixth Amendment rights by rendering ineffective assistance of counsel. Specifically, Burton attributes fault to his trial lawyer for failing to call as witnesses Elijah Horne, Jennifer Shaw, Darryl Miller and Kenneth Bonner. Horne would have testified Simmons told police nearly anything they wanted to hear in exchange for a reduced sentence in his pending robbery case. Shaw, an eyewitness, would have testified Burton did not shoot Ball at the Amoco station. Miller and Bonner had heard Simmons insult Burton in the past, and their testimony would have further undercut Simmons's credibility. In sum, Burton claims his trial lawyer should have called each of these four witnesses to testify in his defense at trial.

Burton raised this claim as part of his post-conviction motion, but the claim was rejected. The Missouri Court of Appeals stated "there is no evidence [Burton's] lawyer was aware of the existence of any of these witnesses except Elijah Horne." Burton v. State, 817 S.W.2d 928, 929 (Mo. Ct. App. 1991). As to Horne, "[t]he motion court found [Burton] had presented no evidence that his attorney was aware prior to trial that Horne possessed any useful information." Id. The Missouri Court of Appeals therefore concluded Burton's lawyer "cannot be held ineffective for failing to call witnesses about whom he or she has had little or no notice." Id. at 929-930.

We must determine whether the Missouri courts' decision was a reasonable application of Strickland v. Washington, 466 U.S. 668 (1984). Our "scrutiny of counsel's performance must be highly deferential," and we "must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Of course, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," id. at 691, but "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," id. at 690-91. Burton therefore has the obligation to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690.

The Missouri Court of Appeals decided Burton failed to carry that burden because Burton's trial lawyer was unable to learn of the existence of three of the four witnesses, and was unable to discern any helpful testimony that a fourth witness could provide at trial. These factual determinations are presumptively accurate, 28 U.S.C. § 2254(e)(1), and they demonstrate that Burton's trial lawyer—while perhaps neither as dogged nor successful as Burton's habeas investigators have been—did not act "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. We find it noteworthy that Burton called none of these witnesses to the stand during the post-conviction hearing in the Missouri trial court, the very proceeding in which the trial lawyer's competence was contested. In these circumstances, we cannot conclude the Missouri Court of Appeals's decision unreasonably applied Strickland. See 28 U.S.C. § 2254(d)(1).

B

Burton next claims his lawyer on direct appeal was ineffective in failing to seek a new trial based upon the newly-discovered evidence of Simmons's jailhouse-recantation. We are unable to attribute fault to Burton's appellate lawyer, however, because there was no available procedure by which he could have raised Simmons's recantation to benefit Burton.

"Missouri procedures do not provide a means for a criminal defendant to present claims of newly discovered evidence to the judiciary after the time to file a Rule 29.11 motion for a new trial have [sic] expired." State v. Garner, 976 S.W.2d 57, 60 (Mo. Ct. App. 1998); see also State v. Mucie, 448 S.W.2d 879, 890 (Mo. 1970). The Missouri Court of Appeals has crafted a narrow exception to this doctrine to permit consideration of newly discovered evidence that completely exonerates a defendant. But Missouri courts regularly refuse to apply this exception to newly discovered evidence that merely impeaches inculpatory evidence offered at trial. E.g., State v. Bransford, 920 S.W.2d 937, 949 (Mo. Ct. App. 1996); State v. Hill, 884 S.W.2d 69, 76 (Mo. Ct. App. 1994).

Simmons's affidavit would not fully have exonerated Burton, and thus Burton's claim does not fit the narrow exception crafted by Missouri courts. Simmons's recantation would not exonerate Burton because the affidavit does nothing to discredit Eddie Walker's independent eyewitness testimony. (There are, perhaps, other reasons to discredit Walker's eyewitness testimony, but those reasons had not been developed at the time of Burton's direct appeal.) Simmons's recanting affidavit is impeachment evidence because it undercuts his own inculpatory eyewitness testimony at trial. But the jury was still presented some evidence, Walker's testimony, from which it could deduce Burton's guilt. Accordingly, under Strickland, we cannot fault Burton's appellate lawyer in failing to raise Simmons's recantation because Burton could not possibly have obtained any relief if the issue had been raised. 466 U.S. at 692 ("[D]eficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.").

C

Burton contends the state violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose a "secret deal" with Simmons to testify against Burton in exchange for a lesser sentence on the stealing charge. Burton defaulted this argument by failing

to raise it during the Missouri post-conviction proceedings. He now seeks to excuse his default by showing his "actual innocence"—what has come to be called the "Schlup gateway" in the awkward lexicon of our habeas jurisprudence. In Schlup v. Delo, the Supreme Court held that a federal habeas court could address the merits of defaulted claims if a prisoner first proved he was actually innocent of the charged crime or crimes. 513 U.S. 298, 314-16 (1995). Framing the question in terms of our case, Burton must prove "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence" before we may review the merits of his Brady claim. Id. at 327.

Burton's Schlup gateway argument is compelling because the new evidence he has gathered casts considerable doubt upon the eyewitness recollections of Simmons and Walker, the only evidence of Burton's guilt proffered at trial. Because the state produced no physical evidence linking Burton to Ball's shooting, and because some of the eyewitness testimony adduced at trial looks increasingly like perjured testimony, Burton may well be able to pass through the Schlup gateway to obtain review of the merits of his Brady claim. We decline to resolve the Schlup gateway question, however, because even if Burton satisfies its exacting standard, his Brady claim cannot carry the day on the merits.

To establish a Brady violation, Burton must first prove the state withheld evidence tending to exculpate him. Second, Burton must demonstrate that the evidence withheld was "material"—that if the evidence had been disclosed, the outcome of the trial would (to a reasonable probability) have been different. Anderson v. Bowersox, 262 F.3d 839, 842 (8th Cir. 2001). A prisoner need not prove he would have been acquitted in order to demonstrate materiality. The second "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

-10-

Simmons allegedly struck two separate deals. The first deal procured Simmons's testimony against Burton at trial in exchange for a reduced sentence on a robbery charge. The state disclosed to the jury the existence of this deal with Simmons. The second deal allegedly procured (or perhaps maintained) Simmons's testimony against Burton in exchange for a reduced sentence on a separate stealing charge. The state never disclosed a second deal to Burton or to the jury, and the state has consistently disputed the very existence of a second plea bargain. Burton believes there was a second deal between Simmons and prosecutors, largely because of a temporal connection: Simmons was charged with stealing before Burton's trial, yet did not plead guilty until after Burton's trial.

Having carefully considered this issue, we do not believe the state's purported withholding of information about Simmons's second, "secret deal" was material. "[P]etitioner's burden is to establish a reasonable *probability* of a different result," Strickler v. Greene, 527 U.S. 263, 291 (1999) (emphasis in original), and we find it improbable that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," Kyles, 514 U.S. at 435. The jury already knew the state had obtained Simmons's testimony via a favorable plea bargain. This knowledge likely swayed the jury's impression of Simmons somewhat, in which case the state's revelation of a second plea agreement would have worsened the jury's already dim impression of Simmons only marginally, if at all.

Even if the first plea agreement made no impact on the jury, however, it is improbable to imagine that news of a second plea agreement would have tipped the balance against Simmons's credibility in a manner that disclosure of the first deal did not. In other words, whether a witness' testimony is compelled by one, or by two, plea agreements does not seem material to us. Cf. Brewer v. Nix, 963 F.2d 1111, 1113 (8th Cir. 1992) (finding no Brady violation where prosecutor disclosed plea agreement, but not immunity deal). Evidence of a second plea agreement is purely

-11-

cumulative for impeachment purposes, and "when the [state] does not disclose a potential source of evidence but the evidence available from that source is cumulative of evidence already available to the defendant, it has committed no <u>Brady</u> violation." <u>United States v. Zuazo</u>, 243 F.3d 428, 431 (8th Cir. 2001) (citing <u>United States v. Quintanilla</u>, 25 F.3d 694, 699 (8th Cir. 1994)).  In either situation, whether the jury knows of one or both plea agreements, the jury is sufficiently apprised of the potential taint on the witness' credibility to ensure a fair trial, and that is the touchstone of the Supreme Court's cases.  <u>See</u> <u>Kyles</u>, 514 U.S. at 421 (considering the "net effect of the evidence withheld by the State").

Burton's trial was not rendered fundamentally unfair by the state's non-disclosure of an alleged second plea agreement, hence we hold Burton suffered no prejudice on account of the prosecutors' conduct.  We do not believe it reasonably probable that the state's wrongful non-disclosure, if such it was, impacted the outcome at trial.

D

Burton also asserts the prosecutor's closing argument deprived him of due process by rendering the entire trial fundamentally unfair.  The prosecutor's closing argument reminded the jury that Burton had not uncovered any alibi witnesses despite having more than six months to investigate the matter before trial.  Burton's trial lawyer objected that the prosecutor had requested the jury to accept an improper inference, but the trial court overruled the objection.

The Missouri Court of Appeals also rejected Burton's argument because the prosecutor did not mention any specific witnesses who might have been called, and because it is appropriate for a prosecutor to comment on a defendant's failure to offer evidence in his own behalf.  <u>State v. Burton</u>, 710 S.W.2d 306, 309 (Mo. Ct. App.

1986).  The Missouri Court of Appeals's decision applies the rules of closing argument under state law, a decision we cannot review.  See May, 251 F.3d at 717.

Burton attempts to steer the discussion clear of state law violations by calling the prosecutor's closing argument a violation of due process that fatally infected the entire trial process.  But Burton's effort to cast the closing argument issue as a question of federal law is unavailing.  A state prosecutor may remind the jury that no alibi witnesses testified to the defendant's account of the events.  Yancey v. Housewright, 664 F.2d 187, 190 (8th Cir. 1981) ("The prosecutor merely stated the obvious. . . . he simply noted that in fact no such witnesses were in existence.").  This appears to be precisely what happened in Burton's case.  "[T]he prosecutor referred to defendant's failure to present evidence of his whereabouts on the night of the shooting.  No particular or named witness who might have been called was mentioned."  Burton, 710 S.W.2d at 309.  "Even if [Burton] had not taken the witness stand, the comment by the prosecutor which merely drew the jury's attention to [Burton's] failure to present alibi witnesses would have been fair comment on the weakness of the defense and was not a violation of [his] right to remain silent."  United States v. Higginbotham, 539 F.2d 17, 25 (9th Cir. 1976) (collecting cases); see Moore v. Wyrick, 760 F.2d 884, 886-87 & n.2 (8th Cir. 1985) (per curiam).  We therefore believe the Missouri Court of Appeals's resolution of this claim was not unreasonable.  See 28 U.S.C. § 2254(d)(1).

E

Marshaling the many affidavits casting doubt upon his guilt, Burton asserts he is entitled to a writ of habeas corpus because new evidence establishes his factual innocence.  Burton's assertion has considerable intuitive appeal, for, to some extent, the very purpose of a writ of habeas corpus is to forestall the unjustified punishment of an innocent prisoner.

Nevertheless, we have squarely rejected the notion that a prisoner may receive a writ simply because he claims he is innocent. "[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Meadows v. Delo, 99 F.3d 280, 283 (8th Cir. 1996) (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993)). It is a foregone conclusion we must apply our earlier precedent, see United States v. Franklin, 250 F.3d 653, 665 (8th Cir. 2001), thus Burton's claim of innocence does not entitle him to a writ.

F

Finally, Burton argues the district court erred in denying him an evidentiary hearing to develop his Schlup gateway argument, as well as the constitutional claims raised in this appeal. We respectfully disagree.

"No evidentiary hearing is warranted if the petitioner's claims are procedurally barred or are without merit." Reese v. Delo, 94 F.3d 1177, 1186 (8th Cir. 1996) (citing Wilson v. Kemna, 12 F.3d 145, 146-47 (8th Cir. 1994)). Our opinion explains that Burton's legal arguments lack merit, thus an evidentiary hearing would not assist Burton in obtaining a writ. A hearing would no doubt cast further attention on Burton's factual claim of innocence, but it is legally unnecessary, and we therefore decline to remand the case for a hearing as Burton suggests.

III

Burton's habeas petition troubles us because his legal claims do not provide him an adequate foundation upon which to present his considerable claims of factual innocence. Though our jurisprudence offers Burton no relief, we express the hope that the state of Missouri may provide a forum (either judicial or executive) in which

-14-

to consider the mounting evidence that Burton's conviction was procured by perjured or flawed eyewitness testimony. In the final analysis, Burton may well be guilty, but the new evidence he has unearthed suggests his case at least deserves a second look.

We affirm the judgment of the district court. We also thank counsel for their particularly capable briefs and arguments.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.