**STATE of Missouri, Respondent,**

v.

**Billy J. JENKINS, Appellant.**

**No. 16044.**

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 5, 1989.

Jim Lynn, Columbia, for appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Appellant Billy J. Jenkins, tried as a prior offender, § 558.016.2,[1] and a persistent offender, § 558.016.3, was found guilty by a jury of the class C felony of stealing property of the value of $150 or more, § 570.030.1 and .3(1), and sentenced by the trial court to five years' imprisonment.

Appellant's sole contention here is that the evidence was insufficient to support a finding that the value of the property stolen was at least $150. Appellant maintains the testimony of the owner regarding the property's fair market value was "tentative and uncertain and appeared to be based on replacement costs ... and was thus not competent evidence of value because the fair market value of the [property] was ascertainable." We set forth only the evidence pertinent to that issue.

Richard Diggs, owner of General Irrigation Company, told the jury his company fabricates irrigation equipment from aluminum. His testimony:

"Q ... Can you describe the type of pieces [of aluminum] that you buy?

A Well, most of it's shapes, structural shapes, special material that we have our own dies for in the ... extrusion plant to make it to fit the product that we're manufacturing."

Appellant was convicted of stealing "assorted pieces of aluminum" from General Irrigation Company. The items were discovered by police in an automobile owned by appellant and occupied by him alone at the time of his arrest. Diggs was notified of appellant's arrest by the police and, at their request, went to the arrest site. Diggs' testimony:

"Q ... what did you see in the car?

A Well, some of the aluminum shapes and ... tubing and material that we normally use in our production....

Q Was it your aluminum that was in the car?

A Oh, no question.

....

Q ... with regard to these particular items, can you tell me exacty [sic] what you use these for?

A We use them, uh, to manufacture components for irrigation systems, pumps and travellers and, uh, various other ... components that we make.

Q Okay. So these are aluminum ... components to irrigation systems?

A That's right.... We cut ... those up in small pieces and run them through the machine shop, and the lathe and mill and so on, to make parts.

Q ... Were these items that were in the ... car ... were these scrap?

A Oh, no, sir.

Q Or were these components that go onto an irrigation system?

A No. These, we buy these pieces in 20–foot lengths and proceed to cut them up until they're all gone, and these were pieces that had been partially used up, and they were all prime material.

1. References to statutes are to RSMo 1986.

Q ... Mr. Diggs, based on your experience and your education in the irrigation industry, would you be able to render an opinion as to the fair market value of these irrigation components that were taken?

A Well, I can tell you what we pay for them, and it averages between three dollars and eighty-five or ninety cents a pound and over five dollars a pound for some of it.

Q ... could you tell me what the fair market value of these items in the aggregate, uh, all combined, were worth on [the date they were taken]?

A We had a list made up that we made out of the price on it, and I can—

MR. ZUZUL:[2] Objection. Not responsive.

A —only vaguely remember it to be about—

MR. ZUZUL: Objection.

A —four hundred dollars.

THE COURT: Objection will be overruled.

Q ... I didn't hear that. What's the fair market value?

A Approximately $400. I, I don't— you know, that's, I'd have to sit down and calculate every piece and everything to get it exact.

Q Okay.

A We have had to spend something between five hundred and a thousand dollars to replace that material to go on manufacturing.

Q How much have you had to spend to replace it?

A Somewhere between five hundred and a thousand dollars. See, we can't buy short pieces; we have to buy full 20-foot piece, and when he took them, he took everything we had to assemble those components, so we had to buy 20-foot lengths to replace it so we could go on and manufacture.

Q Okay.

A We spent somewhere between five hundred and a thousand dollars already."

On cross-examination Diggs conceded his company sold scrap aluminum for "a dollar a pound." Asked whether aluminum corrodes, Diggs replied, "Yes, but to a very limited extent and then stops."

A retired metallurgical engineer, called as a witness by appellant, testified that aluminum is a "galvanic material." The engineer explained, "[I]f it comes into contact with any other particular type of material, the point of contact ... what actually happens is that the ... material begins to deteriorate, and what you actually have is galvanic corrosion." He added that the process is irreversible. The engineer acknowledged he had not personally inspected the aluminum found in appellant's automobile.

The owner of a scrap metal business, testifying at appellant's behest, explained that from time to time he (the witness) bought "heavy extruded aluminum" of the type found in appellant's automobile. Asked what happens to aluminum after it has lain outside in contact with other metal, the witness replied that it "starts to oxidize." The witness professed familiarity with the market value of metals, and stated he pays 50 cents per pound for aluminum like that found in appellant's automobile. On cross-examination the witness admitted he could not give a price for components for an irrigation system, and was familiar only with the scrap value of aluminum. The witness had not personally inspected any items found in appellant's vehicle.

It was stipulated that if Diggs were asked whether he knew how long the items in question had been lying outside before they were taken, he would answer: "No, some of them a day or two and some of them a month. Who knows? No way that I know of."

The rule for determining the value of the stolen aluminum appears in § 570.020(1), which provides:

"Except as otherwise specified in this section, 'value' means the market value of the property at the time and place of the crime, or if such cannot be satisfactorily ascertained, the cost of replacement of the property within a reasonable time after the crime[.]"

---

2. Assistant Public Defender Joseph Zuzul, who represented appellant at trial.

■ As to common classes of personal property, an owner thereof, without further qualifications, may testify to its reasonable market value, and the jury determines the weight and value of such testimony. *State v. Brewer*, 286 S.W.2d 782, 783[1] (Mo.1956). The owner's testimony is competent to establish the property's value even though the owner is not qualified as an expert in appraising such property. *Id.* at 783[2]. An owner's competence to testify as to the value of his property, however, is a presumption that may be rebutted by a showing that he in fact lacks knowledge of the value at issue or that his opinion is based on an improper standard. *DeWitt v. American Family Mut. Ins. Co.*, 667 S.W.2d 700, 708[21] (Mo. banc 1984); *Casada v. Hamby Excavating Co., Inc.*, 575 S.W.2d 851, 855[4] (Mo.App.1978). *Casada* warns that if the foundation for the owner's opinion collapses, so does his opinion. 575 S.W.2d at 855.

Appellant, while acknowledging that Diggs rendered an opinion as to the fair market value of the items taken, argues that Diggs' opinion was tentative and uncertain. Appellant emphasizes Diggs testified he could only vaguely remember that the fair market value was about $400, and he would have to calculate every piece to get an exact amount. Furthermore, says appellant, it appears Diggs was basing his opinion as to value on replacement cost. Appellant points to Diggs' testimony that he spent between $500 and $1,000 to replace the stolen aluminum so he could continue manufacturing.

Appellant likens the instant case to *State v. Foster*, 762 S.W.2d 51 (Mo.App.1988), where the accused was convicted of stealing tires, wheels, wheelcovers, a car stereo, a car battery and other items having an aggregate value of at least $150, by stripping them from an automobile. At trial the automobile's owner was never asked the value of any of the stolen items as of the date they were taken. The only dollar amounts he mentioned were the cost of the battery—he had purchased it a year before the theft—and a price he was quoted for new wheelcovers he evidently never bought. The only other evidence on the subject of value was a document identified by the owner as a written estimate of the replacement cost for the items stolen. The Eastern District of this Court held that the evidence was not probative on the issue of value of the items taken. *Id.* at 54[1]. The Court noted the rule that an owner can testify to his opinion of reasonable value, but pointed out that the evidence was not offered in the form of an owner's opinion concerning the value of the items taken, as the owner had no such opinion. *Id.* at 54. Because the only evidence of value was nothing more than the cost of replacement, the evidence was insufficient to establish the value of the stolen items. *Id.*

Diggs' testimony in the instant case was markedly different than the evidence in *Foster*. As the State points out, Diggs testified (1) the aluminum stolen was not scrap, but instead was "prime material," and (2) based on a list prepared earlier its aggregate fair market value was approximately $400. He did, as we have seen, disclose that it cost between $500 and $1,000 to buy new aluminum so he could continue manufacturing, but he made it clear that the replacement aluminum consisted of 20–foot lengths, which explains the difference between his figure of approximately $400 as the market value of the aluminum stolen and the $500 to $1,000 he spent for replacement aluminum. We reject appellant's thesis that Diggs' opinion that the value of the stolen aluminum was approximately $400 was based on replacement cost.

■ In determining the sufficiency of the evidence to support the verdict we view the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict, and disregard all contrary evidence and inferences. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that appellant was guilty. *State v. Bonuchi*, 636 S.W.2d 338,

340 (Mo. banc 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979). Credibility of witnesses and the weight and value to be given their testimony are matters within the province of the jury and are not for review on appeal. *State v. Wright*, 476 S.W.2d 581, 584[4] (Mo.1972); *State v. Luckinbill*, 744 S.W.2d 872, 874[3] (Mo.App.1988).

Appellant's argument that Diggs' testimony that the value of the stolen aluminum was approximately $400 was tentative and uncertain in that Diggs admitted he would have to calculate every piece to get an exact amount goes to the weight, not the competency, of such testimony. Diggs' testimony, if believed by the jury, was sufficient to support a finding that the market value of the stolen aluminum was at least $150. *State v. McCarthy*, 336 S.W.2d 411, 414–15 (Mo.1960). Had Diggs testified the market value of the stolen aluminum was approximately $150—the crucial sum in determining whether the theft was a felony or only a misdemeanor, § 570.030.3(1) and (3)(k)—appellant's contention might be persuasive. Here, however, Diggs' testimony that the fair market value of the stolen aluminum was approximately $400 was adequate to establish that its market value was at least $150. *State v. Brewer*, 338 S.W.2d 863, 868 (Mo.1960); *State v. Thornton*, 557 S.W.2d 1, 3[5] (Mo. App.1977).

Appellant's evidence that the stolen aluminum was worth a lesser amount as scrap did not nullify the State's evidence that its market value was approximately $400, as the jury was free to believe Diggs' testimony that the aluminum had a market value for manufacturing purposes exceeding its worth as scrap.

Appellant's assignment of error is denied and the judgment is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.