**STATE of Missouri, Respondent,**

v.

**Ted Edward Leroy WEEKS, Appellant.**

**Ted Edward Leroy Weeks, Appellant.**

v.

**State of Missouri, Respondent.**

**Nos. 20107, 22046.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 31, 1998.

Gary E. Brotherton, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel W. Follett, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant, charged with murder in the first degree, § 565.020, RSMo Cum.Supp.1992, was found guilty by a jury of murder in the second degree, § 565.021, RSMo 1986. The jury assessed punishment at thirty years' imprisonment. The trial court entered judgment per the verdict. Appellant brings appeal 20107 from that judgment.

While that appeal was pending, Appellant filed a motion to vacate the judgment pursuant to Rule 29.15.[1] The motion court denied relief after an evidentiary hearing. Appellant brings appeal 22046 from that judgment.

This court consolidated the appeals, Rule 29.15($l$), but addresses them separately in this opinion.

---

1. The current version of Rule 29.15(m) provides that if sentence was pronounced prior to January 1, 1996, post-conviction relief shall be governed by the provisions of Rule 29.15 in effect on the date the motion was filed or December 31, 1995, whichever is earlier. Appellant was sentenced January 25, 1995; his motion for post-conviction relief was filed August 24, 1995. Consequently, the version of Rule 29.15 in Missouri Rules of Criminal Procedure (1995) applies here. References to Rule 29.15 in this opinion are to that version.

## Appeal 20107

Appellant raises four issues in this appeal. He maintains: (1) the evidence was insufficient to support the verdict; (2) he was denied his constitutional right to a speedy trial; (3) the trial court committed plain error in failing to declare a mistrial *sua sponte* when a State's witness "referred to [Appellant's] prior criminal history"; (4) the trial court committed plain error in failing to declare a mistrial *sua sponte* when the prosecutor made allegedly improper remarks during closing argument.

The victim was Levi Hodge. He was stabbed to death in his mobile home December 25, 1992, by Randy Miles. Appellant was present.

The trial court submitted the case to the jury by instructions hypothesizing that Appellant was criminally responsible for Miles's[2] conduct in that Appellant acted with Miles with the common purpose of committing the murder and aided or encouraged Miles in committing it. *See:* § 562.041.1(2), RSMo 1986.

In adjudicating Appellant's claim that the evidence was insufficient to support the verdict, this court accepts as true all of the evidence favorable to the verdict, including all favorable inferences drawn therefrom, and disregards all evidence and inferences to the contrary. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). This court's review is limited to a determination of whether there was sufficient evidence from which a reasonable juror might have found Appellant guilty beyond a reasonable doubt. *Grim,* 854 S.W.2d at 405.

Hodge—the victim—was a "car dealer" in Rolla.

William F. Howard was Hodge's "chauffeur" for "about a year" before the homicide.[3] Howard recounted that in "September or October" of 1992, Hodge made a "deal" with Appellant whereby Appellant was to buy an "El Dorado" from Hodge for $3,600. Appellant took possession of the El Dorado, promising to pay for it "the next Tuesday ... with a credit card."

Appellant failed to appear on the appointed date.

Howard subsequently drove Hodge to Appellant's residence in Maries County several times looking for Appellant and the El Dorado. They found neither. However, Appellant's wife and a child were there. Hodge talked to them.

Howard was at Hodge's mobile home on an occasion when Appellant telephoned Hodge. Hodge's phone was "on ... a speaker," hence Howard heard what Appellant said. Asked to repeat the conversation, Howard testified:

"When Mr. Hodge said, 'I've been looking for you, you son of a bitch,' Mr. Weeks replied, 'I know. And if I would have been here, I would have killed you then.'"

Miles—the stabber—was released from the Missouri Department of Corrections in November 1992 after serving eighteen years and four months of a twenty-year sentence for murder in the second degree. About eight or nine months before his release, Miles "had become really acquainted" with Appellant. Miles told Appellant he (Miles) was "doing time for murder." Miles testified: "At one point [Appellant] had give me a phone number and told me if I needed some help, all I had to do was call him."

After his release, Miles "was having problems adjusting." He contacted Appellant and began visiting Appellant at Appellant's residence. Appellant told Miles about the problem Appellant was having with Hodge. Describing the dispute, Miles testified:

"[Ed[4]] purchased ... an El Dorado ... and supposedly when the original deal was made ... Levi had advised Ed that the only thing wrong with the car was that it needed a tuneup. So Ed gave it a tuneup,

---

2. Once the individuals mentioned in this opinion are identified by name, the opinion henceforth refers to them by their respective surnames. This is done for brevity and clarity; no disrespect is intended.

3. Howard revealed that Hodge "liked to drink a little bit." Howard believed Hodge's "[driver's] license was revoked."

4. Miles referred to Appellant as "Ed."

and it wasn't working right. It ended up at O's Cadillac Company in Jeff City. Supposedly $1400 worth of work was done on it. He drove it from the outskirts of Jeff City to his home, and back to a small town in between, at which time the engine threw a bunch of stuff up on the windshield.... And on top of that, he was served a court order to appear in court for failure to pay the Cadillac company for the work that was already rendered."

Miles was at Appellant's residence "somewhere around the first part of December [1992]." He overheard a telephone conversation between Appellant and Hodge. Asked what Appellant told Hodge, Miles replied:

"There was discussions about money owed and that it would be taken care of. And Ed was upset and told Levi that if he didn't quit pestering his family that he was going to kill him."

Miles spent "the weekend before Christmas [1992]" at Appellant's residence. One night that weekend a car entered the driveway and "some people got out." Miles suspected "it was going to be a drive by shooting over the situation that was going on with Levi." Miles, Appellant and Appellant's "oldest boy" armed themselves and went outside. The unknown people "jumped in the car and ... took off." Although Miles and Appellant never confirmed that Hodge was involved in the incident, Miles told Appellant he "ought to get ahold of Levi and straighten things out, because his family didn't deserve to live under that kind of stress and strain."

Miles and Appellant subsequently went to Hodge's mobile home "to see if [they] could talk to him." Miles was armed with "an over and under." Appellant was armed with a .32 caliber pistol. Asked why they were armed, Miles answered:

"Levi has a reputation of being very unscrupulous and having a backup, because he had done a lot of things wrong to a lot of people. And we ... didn't want to walk in and him have five or six people and making something ignorant happen; walk in deaf, dumb and blind."

Hodge was not home. Miles and Appellant did not look for him elsewhere.

On Christmas Eve 1992, Miles was experiencing "anxiety attacks." He phoned Appellant. Appellant invited Miles to "come on up" and added that they might "take a run over and talk to Levi and try to get things squared away."

Appellant contacted Hodge and arranged a meeting for "7:00 or 8:00" on "Christmas night."

Miles drove to Appellant's residence. There, they drank beer and discussed the impending meeting with Hodge. Miles was to be Appellant's "backup." Miles explained:

"[I]n the event things got ugly, we were prepared to defend ourselves and do whatever was necessary."

Miles armed himself with the .32 caliber pistol and "a Bowie hunting knife." Appellant carried a ".25 automatic."

Miles told the jury he considered Appellant "a brother." Miles described the relationship:

"[U]nder the convict code which I live, if I'm ever called upon by a partner or a friend to give him backup, then he has the control of the situation and I am there only to the capacity that is needed or asked for or required.... [Ed] was well aware of that, directly and indirectly.... [H]e was very well aware of what the convict code is because it had been discussed."

When Miles and Appellant arrived at Hodge's mobile home, Appellant introduced Miles to Hodge as "a prospective buyer for a car."

Inside the mobile home, Appellant and Hodge discussed the sum owed Hodge on the El Dorado, the $1,400 repair bill, and Appellant "having to go to court."

Miles asked to use the bathroom. Hodge told Miles to "use the one up in the front bedroom."

After relieving himself, Miles saw "a stack of Polaroid pictures on the back of the commode." According to Miles, the pictures showed children, and some pictures "portrayed sexual situations."

Miles, who had been sexually abused as a child,[5] became "enraged." He put on a pair of leather gloves, removed the pistol from his waistband beneath his coat, and started out of the bathroom.

At that point, the conversation between Appellant and Hodge turned to the possibility of Miles "test driving a Cadillac." Miles "snapped out of the emotional turmoil" and "realized this was Ed's situation." Miles reentered the bathroom, removed the gloves, returned the pistol to his waistband, and exited the bathroom.

Hodge handed Miles a ten-dollar bill and the keys to a Cadillac. Hodge told Miles to drive to a gasoline station, put five dollars worth of gasoline in the car, and when he returned they would "talk about that car."

When Miles returned to Hodge's residence, Appellant and Hodge were still conversing. Miles handed Hodge the Cadillac keys and "five dollars in change."

Miles began thinking about the pictures of the children; this caused him anger and turmoil. He entered the bathroom, put on the gloves, withdrew the pistol, returned to the living room, levelled the pistol at Hodge's face, and told him "the time for talking was over."

Hodge said that if Miles and Appellant needed money, he "could go to the bank tomorrow."

Miles "snapped out" of his anger and realized he had "overstepped [his] boundaries." Miles "backed up" and handed the pistol to Appellant. However, added Miles: "I had the knife out and I was within range of Levi, that if Levi had tried to hurt Ed or do anything that I could get between the two of them."

Appellant and Hodge resumed their conversation. Hodge "wouldn't come to any real agreements."

Describing what occurred next, Miles testified:

"I got to thinking about the pictures and about the way that Levi was treating my partner, which according to the rules I live by, was totally wrong. And I got frustrated enough I pulled him—I had the knife in my hand. I got out of my chair, reached across the coffee table, grabbed Levi by the hair at the back of the head and the collar, and told him the time for talking was over with."

Miles took Hodge toward the back bedroom. In the hallway, Appellant told Miles: "Hold up. Let me try one last time."

At that point, Miles had "pinned [Hodge] up against one wall with one arm, and had the knife in the other hand."

Appellant told Hodge he (Appellant) knew Hodge had money and they could "call it even for everything that's happened."

Hodge said, "I don't have any."

Appellant thereupon told Hodge, "That man right there in front of you, all I've got to do is tell him to kill you and he will."

Hodge again declared he had no money. At that point, according to Miles:

"Ed said, 'I'm going to ask you one more time.' Levi said, 'I don't have any.' Ed looked at me and he said, 'Kill him. Kill him.' "

Miles thereupon stabbed Hodge "in the kidney area." A brief struggle ensued. Then, said Miles:

"I told [Hodge], 'There's a lot more wrong with you than what Ed even knows, but I know.' And I called him a freak, and a snake, and a few other things, all in perspective of penitentiary slang, as Levi had been to prison at one point . . . . at first he didn't know what I was saying, and then he did realize what I was saying. I told him, 'I'm giving you better than what you deserve.' "

Miles then attempted to stab Hodge on the top of his head so that "death was immediate and over with." However, Miles was unable to do so; consequently, he stabbed Hodge in the chest "between 15 and 20 times."

---

**5.** Miles testified that when he was nine, his stepfather forced him "at gunpoint" to "try to have sex" with Miles's four-year-old sister. Additionally, Miles was subjected to watching his stepfather "sexually involved" with Miles's sister.

As Hodge was dying from those wounds, Miles told Hodge he "got better than what he deserved."

Appellant asked, "Is it over?"

Miles answered yes.

Appellant asked, "Did it really have to go like this?"

Miles responded, "Well, there's something I know that you don't, and it's easier to show you than tell you."

Miles then took Appellant to the front bathroom and showed him the pictures of the children.

From his experience as a "paralegal" working with inmates on their cases, Miles was aware of the importance of physical evidence. He put several items of possible evidentiary value into "a couple of sacks and a satchel." He also wiped away fingerprints.

Miles carried the containers outside, walked past some other trailers, and threw the containers across a fence into shrubbery on a vacant lot.

Miles then drove himself and Appellant to Appellant's residence, where they spent the night.

The next morning, Appellant drove himself and Miles back to Hodge's mobile home. Miles walked to the area where he had tossed the sacks and satchel. He retrieved them and reentered Appellant's car. The duo then returned to Appellant's residence.

Sometime that day (December 26, 1992), a lady who was expecting Hodge to pick her up for a trip to St. Louis phoned the proprietor of the mobile home park and asked him to check on Hodge. The proprietor went to Hodge's mobile home, found the door unlocked, entered, and discovered Hodge's corpse.

Later that day, Appellant and Miles drove to Columbia, Missouri, in an automobile "titled to" Appellant's wife. There, the duo spent the night with an acquaintance. The next day, they drove to Wolcott, New York, a "little town" near the Canadian border. Explaining the reason for the journey, Miles testified:

"If we obtained any heat or there was any reason for the authorities to actually link us to it, if there was any loose ends, we would be able to know and have enough time to go into Canada."

Appellant and Miles remained in Wolcott until "New Year's Eve," when they started back to Missouri.

On March 15, 1993, Miles, while driving an automobile "registered to [Appellant's] wife," was arrested for a crime unrelated to the Hodge murder. Officers searched the automobile and found the knife Miles had used in stabbing Hodge. Miles admitted murdering Hodge, but initially revealed nothing about Appellant's involvement. Later, Miles implicated Appellant.

Appellant was arrested at his residence during the early morning hours of March 16, 1993.

On January 10, 1994, Appellant was confined in the Texas County jail [6] awaiting trial. Jailers allowed Appellant to "take the trash out in the mornings." On that date, while performing that task, Appellant entered an automobile "sitting to the left of the trash bin." The automobile, driven by an unidentified person, departed.

Appellant was arrested in Arkansas and brought back to the Texas County jail three days after he fled.

On September 12, 1994, pursuant to a plea agreement, Miles pled guilty to murder in the first degree. In compliance with the agreement, the prosecutor waived the death penalty and dismissed a charge of armed criminal action. As part of the bargain, Miles agreed to testify truthfully at Appellant's trial.[7]

Appellant was tried December 27–30, 1994.

■ Appellant's first point avers the evidence was insufficient to support the verdict in that the only reasonable inference is that Miles murdered Hodge because Miles believed Hodge was a pedophile, not because of anything Appellant said or did. Appellant

---

6. As explained later in this opinion, this case was transferred from Phelps County to Texas County.

7. The account of the stabbing in this opinion was gleaned from Miles's testimony.

lists six circumstances which, according to him, support that conclusion.

First, Appellant reminds us that after the stabbing, he asked Miles, "Did it really have to go like this?" Appellant insists such a remark is inconsistent with an inference that he coldly directed Miles to kill Hodge.

This court disagrees. The jurors could have reasonably found that after the stabbing, Appellant, recognizing the gravity of what he had ordered Miles to do and appalled by the horror, was contritely pondering whether he should have issued the fatal command and, in that mood, uttered the question as a rhetorical self-inquiry.

Second, Appellant asserts that immediately after the stabbing, Miles described Appellant "as being in a drunk stupor and not very coherent."

As this court fathoms Appellant's brief, he bases that assertion on Miles's description of Appellant's condition while the duo was returning to Appellant's residence after the stabbing. Miles testified:

"Ed was basically in shock at that point. And he was so much into shock it was like a drunk stupor. He was mumbling and not being very coherent."

Apparently, Appellant's premise is that because he was in that condition, no juror could reasonably believe he coldly ordered Miles to kill Hodge.

Appellant's premise is unpersuasive. Miles testified that subsequent to the stabbing, and after Appellant saw the pictures of the children, Appellant sat down and vomited. Miles attributed this to the alcohol Appellant had consumed and "the reality of Levi's death." However, there was no evidence that Appellant was in "shock" or a "stupor" at the time he gave Miles the command: "Kill him. Kill him."

Third, Appellant argues that the evidence demonstrated Miles's motivation for murdering Hodge was Miles's belief that Hodge was a "freak" who "enjoyed child pornography."

The State responds that despite Miles's anger toward Hodge over the pictures, Miles recognized the decision whether to kill Hodge was Appellant's, as (1) Miles, after levelling the pistol at Hodge's face, realized he had "overstepped" his role and handed the pistol to Appellant, and (2) when Miles had Hodge pinned against the wall in the hallway, Appellant told Miles to "Hold up," and Miles complied. It was only when Appellant gave the command to kill that Miles began stabbing Hodge. That Miles may have taken satisfaction in killing Hodge because of Miles's perception that Hodge was a pedophile does not demonstrate that Miles would have killed Hodge absent Appellant's command.

Fourth, after Miles killed Hodge, Miles showed Appellant the pictures of the children. Appellant asserts this reveals Miles murdered Hodge because of the pictures.

This court holds the jurors were not compelled to draw that inference. The jurors could have reasonably found that Miles, sensing Appellant might be having second thoughts about the murder Appellant had ordered Miles to commit, showed Appellant the pictures to demonstrate that Hodge deserved killing.

Fifth, Appellant seizes upon the following passage from Miles's testimony.

"Q If Ed Weeks had not said, 'Kill him. Kill him,' in the hallway of Levi Hodge's trailer, would you have stabbed Mr. Hodge at that point?

A In all truthfulness, I don't know.

Q Did you stab him because Ed Weeks said, 'Kill him. Kill him'?

A There was two equal measures. One, that I believed he was a pedophile; and two, Ed said to, yes. Both basically equally.

Q You talked about the convict code earlier. As you understand those principles or those principles you live by, was Ed Weeks in control of the situation that night in Levi Hodge's trailer? Was he the one you were supposed to obey?

A Yes.

Q And did you?

A Yes."

Appellant fails to explain how that testimony exonerates him of criminal liability for

Hodge's murder. The evidence was that Miles desisted when Appellant said, "Hold up," and that Miles killed Hodge only after Appellant gave the command: "Kill him. Kill him."

Sixth, Appellant points out that when Miles pled guilty to murdering Hodge, Miles was asked whether he stabbed Hodge in self-defense. Miles replied: "Only in the defense of ideas of right and wrong." Appellant maintains this demonstrates Miles murdered Hodge because Miles "wanted to rid the world of one more pedophile."

As explained earlier, the jurors could have reasonably found Miles believed Hodge deserved killing. However, the jurors could also have reasonably found that Miles did not kill Hodge on Miles's own volition, but instead recognized it was Appellant's decision as to whether Hodge would die.

■ In that regard, the State emphasizes that two people (Miles and Howard) heard Appellant threaten to kill Hodge. The State also points out that Appellant demonstrated his control over whether Hodge lived or died by telling Hodge, "That man right there in front of you, all I've got to do is tell him to kill you and he will." Additionally, the State notes that after the murder, Appellant fled twice, once with Miles to Wolcott, New York, and later from the Texas County jail to Arkansas. Evidence of flight, whether from the scene of the crime or elsewhere, is admissible to show an accused's consciousness of guilt. *State v. Chapman*, 876 S.W.2d 15, 18[6] (Mo. App. E.D.1994). Such evidence may include an escape from jail which occurs subsequent to the accused's initial arrest. *Id.*

■ Appellant's first point, while exhibiting praiseworthy industry and ingenuity by his appointed counsel, is nothing more that a skillfully packaged invitation for this court to substitute its assessment of Miles's testimony for that of the jury—an invitation this court is compelled to decline. Credibility of witnesses and the weight and value to be given their testimony are matters within the province of the jury and are not for review on appeal. *State v. Euer*, 910 S.W.2d 352, 353[2] (Mo.App. S.D.1995); *State v. Jenkins*, 776 S.W.2d 59, 62–63[3] (Mo.App. S.D.1989).

Appellant's first point presents a well-crafted jury argument, but no basis for reversal.

This court holds the evidence, viewed favorably to the verdict, was sufficient to support a finding by a reasonable juror, beyond a reasonable doubt, that Appellant was guilty of murder in the second degree as submitted in the verdict-directing instruction for that offense. Appellant's first point is denied.

Appellant's second point avers his constitutional right to a speedy trial was abridged in that there was a 651–day delay between his arrest and trial. According to Appellant, the delay was prejudicial in that "one witness died and another disappeared." Consequently, maintains Appellant, his conviction must be reversed.

Adjudicating Appellant's second point requires a chronological account of the significant events between arrest and trial.

March 17, 1993 (the day after Appellant's arrest). Judge Haslag schedules preliminary hearing for April 21, 1993.

March 25, 1993. Appellant files motion for speedy trial.

March 30, 1993. Appellant files application for change of judge.

April 5, 1993. Application for change of judge granted. Case assigned to Judge Sheffield.

April 7, 1993. Judge Sheffield schedules preliminary hearing for April 29, 1993.

April 28, 1993. Appellant and prosecutor jointly request continuance of preliminary hearing "in that discovery is not complete." Judge Sheffield reschedules preliminary hearing for June 1, 1993.

June 1, 1993. Preliminary hearing held. Appellant "bound over" for arraignment on June 7, 1993.

June 3, 1993. Prosecutor files information.

June 7, 1993. Appellant arraigned before Judge Long.

June 15, 1993. Judge Long hears and denies Appellant's motion for reduction of bond. Parties stipulate that case be transferred from Circuit Court of Phelps County to Circuit Court of Texas County.

June 21, 1993. Order filed transferring case to Circuit Court of Texas County.

June 28, 1993. Case file received by Circuit Court of Texas County.

September 13, 1993. Appellant files motion for trial setting, asking that trial be "set for the week of October 25, 1993 or as soon thereafter as is practicable."

September 23, 1993. Appellant files amended motion for trial setting. It avers he "is ready for trial."

October 4, 1993. Judge Long schedules trial for April 11, 1994, "the ... court's first available setting."

January 10, 1994. Appellant escapes from Texas County jail, as detailed earlier in this opinion.

January 13, 1994. Appellant brought back from Arkansas to Texas County jail.

February 8, 1994. Judge Long hears and rules on numerous motions filed earlier by Appellant. Prosecutor tells Judge Long:

"I think the Court's aware that Mr. Weeks escaped or absconded from the jail on January 10 and he was gone for two or three days. In that interim, I was set for a trial in Federal Court in St. Louis during the time that this trial was set. At the time I was set, which was in a telephone conference with Judge McDonald in St. Louis, I did not know how long Mr. Weeks would be gone or if we would ever find him and did not know if this trial date would continue. So I've now been set for a trial in Federal Court.

As I say, I'm not necessarily looking for an extension of the trial date. If we can find an appropriate time sooner, I'll be happy to accommodate the Defendant and the Court, but I'm now set for trial in two jurisdictions at the same time[.]"

March 21, 1994. Prosecutor files application for change of judge. Application avers Judge Long "is standing for re-election" and prosecutor "has filed as a candidate" for the judgeship held by Judge Long. Motion asserts Judge Long's "impartiality may be called into question by reason of his being an opposing candidate to the Prosecuting Attorney during the pendency of the litigation."

April 11, 1994. Judge Long files order granting application for change of judge and transferring case to Judge Wiggins.

As reported earlier, Appellant's trial began December 27, 1994. Judge Wiggins presided.

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court of the United States had to decide whether an accused was entitled to a reversal of his murder conviction and life sentence because more than five years elapsed between his arrest and trial. Affirming the conviction, the court explained that unlike deprivation of the right to counsel or the right to be free from compelled self-incrimination, denial of the right to a speedy trial does not *per se* prejudice the accused's ability to defend himself. 407 U.S. at 521, 92 S.Ct. at 2187[1]. The opinion continued:

"[T]he right to speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate."

407 U.S. at 521, 92 S.Ct. at 2187[2] (footnote omitted).

Discussing the remedy for denial of an accused's constitutional right to a speedy trial, the court declared:

"The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy."

407 U.S. at 522, 92 S.Ct. at 2188[4] (footnote omitted).

The court in *Barker* then set forth the test by which courts must determine whether an accused has been denied his constitutional right to a speedy trial:

"A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U.S. at 530, 92 S.Ct. at 2192[17] and [18] (footnote omitted).

In *State v. Bolin,* 643 S.W.2d 806 (Mo. banc 1983), the Supreme Court of Missouri, in determining whether an accused's constitutional right to a speedy trial was violated, said: "We will assume ... that appellant's right to a speedy trial accrued when he was first arrested[.]" *Id.* at 813. There, 275 days elapsed between the accused's arrest and trial. *Id.* Although the court attributed some of the delay to a "strong excuse," the court held the delay presumptively prejudicial. *Id.* at 813–14. Nonetheless, after weighing the other factors enumerated in *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192[17], the court in *Bolin* held the accused's constitutional right to a speedy trial was not "breached." 643 S.W.2d at 816.

■ Appellant maintains, and this court agrees, that the 651–day delay between his arrest and trial was presumptively prejudicial. *See: State v. Bohannon,* 793 S.W.2d 497, 503–04[4] (Mo.App. S.D.1990), and cases cited there. The State tacitly concedes as much. Consequently, *Barker* and *Bolin* require this court to examine the other three factors of the *Barker* test. *Accord: State v. Perry,* 954 S.W.2d 554, 565–66[18] (Mo.App.

S.D.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2062, 141 L.Ed.2d 139 (1998).

■ The second factor is the reason for the delay. In the instant case, some of the delay was either caused by Appellant or agreed to by him. His successful application for a change of judge from Judge Haslag caused the preliminary hearing to be rescheduled for a later date. His request for continuance of the rescheduled preliminary hearing, joined in by the prosecutor, resulted in another delay of the preliminary hearing.[8] His stipulation that the case be transferred from the Circuit Court of Phelps County to the Circuit Court of Texas County also caused some of the delay. Finally, his escape from the Texas County jail on January 10, 1994, resulted in the loss of the April 11, 1994, trial setting, as the prosecutor acquiesced in a Federal bankruptcy trial setting for that date after the escape and before Appellant's capture.[9]

It is difficult, however, to calculate the precise number of days of delay attributable to Appellant from the record before us. Evidently, some of the delay resulted from the overcrowded schedule of Judge Long and later the similarly overcrowded schedule of Judge Wiggins. Such delays are weighed against the State, but not heavily. *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192[20].

It is also inferable that some of the delay was caused by the prosecutor's successful application for a change of judge from Judge Long. While the extent of that delay cannot be calculated from the record, Appellant was obviously not responsible for any of it.

Appellant maintains the second factor must be weighed heavily against the State. The State responds that because some of the delay was attributable to Appellant and his escape caused the loss of the April 11, 1994, trial date, the second factor must be weighed against him.

where he disappeared shortly after his initial arrest and remained at large for some five years. Although Appellant here was at large for only three days, it is inferable that the prosecutor would not have acquiesced in the bankruptcy setting had Appellant not escaped.

8. Delays joined in or consented to by an accused are excluded in calculating whether he was denied his right to a speedy trial. *Cf. State v. Allen,* 954 S.W.2d 414, 417[15] (Mo.App. E.D.1997).

9. In *United States v. Jones,* 23 F.3d 1407, 1408[2] (8th Cir.1994), the court held the accused's constitutional right to a speedy trial was not violated

Although the record is too vague to enable this court to count the days of delay attributable to each side, this court finds from the record in toto that the State was responsible for more of the delay than Appellant. This court is persuaded—as asserted by Appellant—that the prosecutor wanted to bring the case against Miles to a conclusion before Appellant was tried, intending to use Miles as a witness against Appellant if possible. That strategy was apparently one of several reasons for the delay. This court therefore weighs the second factor against the State, but not heavily.

■ The third factor is the accused's assertion of his right to a speedy trial. The chronology set forth earlier demonstrates Appellant repeatedly asserted that right, but he also escaped from jail three months before his trial was scheduled to begin on April 11, 1994. Nonetheless, the State concedes the third factor must be weighed in Appellant's favor.

■ The fourth factor is prejudice to the accused. Appellant proclaims he was prejudiced in that his ability to present a defense was impaired. Specifically, Appellant avers one witness—Sheriff Roy Bassett of Maries County—died before Appellant's trial, and another witness—Lola Redwine—disappeared before Appellant's trial.

Endeavoring to demonstrate that Bassett would have been a helpful witness, Appellant's brief asserts Bassett was one of the officers who interviewed Appellant's wife at the time of Appellant's arrest. According to Appellant, the interview of his wife led him to say, "Well, if I make a statement or tell you what happened, will you leave my wife out of this?" [10]

Appellant fails to explain how Bassett's testimony would have aided him. The record indicates Bassett's only participation in the case was during Appellant's arrest. Appellant makes no claim in this appeal that any statement he made during or after his arrest was erroneously received in evidence. Furthermore, if anything Bassett said to Appellant's wife, or anything she said to Bassett, was beneficial to Appellant and admissible in evidence, Appellant's wife could have testified about it without fear of contradiction by Bassett.

Furthermore, the record does not reveal when Bassett died, hence there was no showing that Bassett would have been available had Appellant been tried swiftly after his arrest.

■ Any claimed prejudice resulting from delay must be actual and apparent on the record or by reasonable inference. *State v. Davis*, 903 S.W.2d 930, 937[30] (Mo.App. W.D.1995); *State v. Darnell*, 858 S.W.2d 739, 746[8] (Mo.App. W.D.1993). Speculative or possible prejudice is not sufficient. *Id.*; *State v. Robinson*, 696 S.W.2d 826, 832[12] (Mo.App. W.D.1985).

For the reasons set forth above, this court holds the record fails to demonstrate that the delay between Appellant's arrest and trial deprived him of favorable admissible testimony about the interview between Bassett and Appellant's wife.

As to Redwine, Appellant notes that Miles testified he was in the Osage County jail March 15, 1993, and spoke to Redwine while he was "trying to provide protection for [Appellant]."

Appellant's brief avers: "Miles' statements to Ms. Redwine apparently would have contradicted his statements to the police." In support of that averment, Appellant's brief cites an unsworn statement by Appellant to the trial court during the hearing on Appellant's motion for new trial. However, the trial court was not compelled to believe Appellant. *State v. Duckett*, 849 S.W.2d 300, 305 (Mo.App. S.D.1993); *State v. Pinkus*, 550 S.W.2d 829, 837–38[18] (Mo.App.1977).

Furthermore, like Bassett, the record does not demonstrate that Appellant could have produced Redwine at trial had Appellant been tried swiftly after his arrest.

---

**10.** That remark was attributed to Appellant by Sergeant Ralph Roark of the Missouri State Highway Patrol at a February 8, 1994, hearing before Judge Long on a motion to suppress.

Roark recounted that at the time Appellant made the remark, his wife had already been interviewed by Bassett and Sergeant Robert North of the Missouri State Highway Patrol.

For the reasons set forth above, this court holds the record fails to show that Appellant was deprived of favorable testimony by Redwine because of the delay between Appellant's arrest and trial.

Appellant claims the delay also prejudiced him in that he "was forced into bankruptcy and became estranged from his daughter." In support of that assertion, Appellant cites an allegation in an unsworn motion signed by his lawyer and filed in the trial court.

■ An appellate court cannot accept counsel's statements as a substitute for record proof, even though the court has no reason to doubt counsel's accuracy. *AJM Packaging Corp. v. Crossland Construction Co.*, 962 S.W.2d 906, 910[3] (Mo.App. S.D. 1998); *Re Redemption Proceeding by Hokanson*, 706 S.W.2d 559, 560[1] (Mo.App. S.D. 1986). Furthermore, there was no showing that Appellant could have avoided his alleged bankruptcy had he been tried swiftly after his arrest.

Additionally, the record indicates Appellant was not estranged from his daughter, as she testified as a witness for him at trial, contradicting Miles's testimony about the incident characterized by Miles as a possible "drive by shooting."

Finally, § 558.031.1, RSMo 1994, entitles Appellant to credit against his sentence for all of the time he spent in confinement after his arrest, hence the delay between arrest and trial will not result in his serving more time than he would have served had he been tried swiftly after his arrest.

This court holds the record fails to establish that the delay was prejudicial to Appellant. The fourth factor is therefore weighed against him.

■ Balancing all of the factors discussed above, this court holds the delay between Appellant's arrest and trial, while inordinate, was not so egregious as to constitute a denial of his constitutional right to a speedy trial. Appellant's second point is denied.

■ Appellant's third point has two components; only the first pertains to appeal 20107. That component avers the trial court committed plain error in failing to declare a mistrial *sua sponte* when Miles told the jury he became "really acquainted" with Appellant eight or nine months before Miles was released from the Department of Corrections. Appellant reminds this court that prior to Miles's testimony, the trial court instructed Miles:

> "The fact that the defendant has prior convictions or that you met him in prison is not to be mentioned by you in any answer to any question."

Appellant proclaims that the testimony complained of in the first component of his third point "unmistakably referred to [Appellant's] prior criminal history in violation of the trial court's order and deprived [Appellant] of his rights to due process and a fair trial before a fair and impartial jury."

For convenience, this court henceforth refers to the testimony assailed in the first component of Appellant's third point as "the third point testimony." Appellant acknowledges that the lawyer who represented him at trial[11] did not object to the third point testimony, hence the first component of the third point is not preserved for review.

■ Nonetheless, Appellant argues he is entitled to plain error relief under Rule 30.20.[12] That rule empowers appellate courts to consider unpreserved plain errors affecting substantial rights. However, relief under that rule is granted only when the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice inexorably results if the error is left uncorrected. *State v. Hadley*, 815 S.W.2d 422, 423[1] (Mo. banc 1991).

As the State points out, Miles never testified Appellant was an inmate. From Miles's testimony, one might suppose Miles became acquainted with Appellant because Appellant visited the prison or because Appellant was employed there in some capacity. Vague

---

11. The lawyer representing Appellant in these appeals is not the lawyer who represented him at trial.

12. References to Rule 30 in this opinion are to the version in Missouri Rules of Criminal Procedure (1998).

references cannot be characterized as clear evidence associating an accused with other crimes. *State v. Hornbuckle*, 769 S.W.2d 89, 96 (Mo. banc 1989), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989).

However, there is a more compelling reason that no manifest injustice or miscarriage of justice resulted from the third point testimony.

In *State v. Johnson*, 753 S.W.2d 576 (Mo. App. S.D.1988), the accused was convicted by jury of three counts of burglary and two counts of stealing. *Id.* at 577. The accused's accomplice, testifying for the State, revealed he and the accused met while they were in jail and planned to commit burglaries upon their release. *Id.* at 578. On appeal, the accused complained that the accomplice's testimony constituted evidence that the accused had committed crimes other than those for which he was on trial. *Id.* at 579. This court reviewed several cases on the subject, then discussed a common law principle characterized as the "parallel exception" to the rule barring evidence of other crimes. *Id.* at 580–81. This court said:

> "That exception permits proof of another crime if such crime is so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other. Under this exception the state is permitted to paint a complete and coherent picture of the crime charged and it is not required to sift and separate the evidence tending to prove the crime for which the accused is not on trial."

*Id.* at 581 (citations omitted).

This court held in *Johnson* that the accomplice's testimony was admissible. *Id.*

In the instant case, the State's theory was that Appellant knew the "convict code" to which Miles adhered and also knew Miles had served a prison sentence for murder. The State's hypothesis was that those circumstances, coupled with Miles's friendship with Appellant, demonstrated that when Appellant ordered Miles to kill Hodge, Appellant knew Miles would carry out the order. Absent that evidence, the jurors might have been dubious that Miles killed Hodge because Appellant told him to.

In that regard, Appellant attempted to persuade the jurors at trial, and this court on appeal, that Miles killed Hodge because Miles perceived Hodge as a pedophile, not because of Appellant's command. The third point testimony was clearly relevant on that issue. Consequently, the third point testimony was probably admissible under the "parallel exception" recognized in *Johnson* and the cases cited there.

Because the third point testimony was clearly relevant and arguably admissible, this court holds no manifest injustice or miscarriage of justice resulted therefrom. The first component of Appellant's third point is denied.

Appellant's fourth point asserts the trial court committed plain error in failing to declare a mistrial *sua sponte* when the prosecutor made allegedly improper remarks during closing argument. Appellant acknowledges that the lawyer who represented him at trial did not object to the allegedly improper remarks, hence the fourth point is not preserved for review. Nonetheless, Appellant argues he is entitled to plain error relief under Rule 30.20, discussed earlier.

Plain error review should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review. *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). Relief should rarely be granted on assertions of plain error as to closing argument because, in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention. *Id.* Accordingly, plain error relief is granted because of improper argument only if is established that the argument had a decisive effect on the jury's determination. *State v. Parker*, 856 S.W.2d 331, 333[3] (Mo. banc 1993).[13]

---

13. As observed in *State v. Derrick*, 965 S.W.2d 418, 419–20[2] n. 1 (Mo.App. S.D.1998), appellate courts are wary of claims that a trial court erred in failing to declare a mistrial *sua sponte* in a criminal case. That is because generally, the double jeopardy clause of the Fifth Amendment

Having examined the prosecutor's remarks complained of in Appellant's fourth point, this court, consistent with *Silvey* and *Parker*, declines to grant plain error relief. In doing so, this court notes that *State v. White*, 952 S.W.2d 802 (Mo.App. E.D.1997), relied on by Appellant, is inapposite in that it involved a *preserved* claim of error about *accomplice testimony*, not an *unpreserved* claim of error about a *prosecutor's argument.* No jurisprudential purpose would be served by further discussion of Appellant's fourth point. It is denied per Rule 30.25(b).

Judgment affirmed.

## Appeal 22046

The only claim of error in this appeal is the second component of Appellant's third point. It avers the lawyer who represented Appellant at trial ("Defense Counsel") rendered ineffective assistance in failing to object to the third point testimony (discussed earlier) and in failing to move for a mistrial when that testimony was adduced.

Defense Counsel, called as a witness by Appellant at the evidentiary hearing in the motion court (33 months after Appellant's trial), was asked whether she had a "trial strategy reason for not objecting to various inferences that [Appellant] had done time with Mr. Miles." Defense Counsel responded:

"As I sit here now, if he had volunteered something about a convict code, I don't know that I would have objected and highlighted that for the jury; but again, it would be in the record. And I certainly did not want evidence that [Appellant] had been in prison in front of the jury."

Apparently, Appellant's hypothesis of ineffective assistance is that Defense Counsel should have objected to the third point testimony because the jurors could have inferred

from it that Appellant had a "prior criminal history." According to Appellant, had Defense Counsel moved for a mistrial, the trial court would have granted one.

This court is not persuaded that the trial court would have sustained an objection to the third point testimony had Defense Counsel registered one, nor is this court convinced that the trial court would have granted a mistrial had Defense Counsel moved for one. As we have seen, Miles never testified Appellant was an inmate when they became acquainted, nor did Miles reveal how Appellant acquired direct knowledge of the "convict code." Miles testified only that the code "had been discussed."

 As explained earlier in this opinion, the third point testimony was arguably admissible. Failure to object to admissible evidence is not ineffective assistance of counsel. *State v. Parker*, 886 S.W.2d 908, 932[99] (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

The motion court found Defense Counsel "performed competently" during Appellant's trial and Appellant was not prejudiced by Defense Counsel's "decision to not object."

This court's review of the motion court's judgment is limited to a determination of whether the findings and conclusions of that court are clearly erroneous. Rule 29.15(j); *Leisure v. State*, 828 S.W.2d 872, 873–74 (Mo. banc 1992), *cert. denied*, 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). Such findings and conclusions are clearly erroneous only if, after review of the entire record, this court is left with the definite and firm impression that a mistake has been made. 828 S.W.2d at 874.

Applying that standard, this court holds the motion court did not clearly err in rejecting Appellant's claim of ineffective assistance.

 It is reasonable trial strategy to forego an objection to evidence where the

to the Constitution of the United States bars retrial if a judge grants a mistrial in a criminal case without the defendant's request or consent. *State v. Tolliver*, 839 S.W.2d 296, 299[9] (Mo. banc 1992). Consequently, a judge who declares a mistrial in a criminal case *sua sponte* may thereafter be confronted by the defendant's contention that he cannot be retried. Reversing convictions because trial courts fail to declare mistrials *sua sponte* allows defendants to remain

mute when incidents unfavorable to them occur during trial, gamble on the verdict, then obtain a new trial if the verdict is adverse. This puts trial courts in an untenable position and is contrary to the principle that an appellate court will not, on review, convict a trial court of error on an issue which was not put before it to decide. *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36[12] (Mo. banc 1982), *appeal dismissed*, 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983).

damage is minimal or nonexistent and there is no assurance an objection will succeed. *State v. Clark,* 975 S.W.2d 256, 265 (Mo.App. S.D.1998).

Any juror who suspected from Miles's testimony that Miles became acquainted with Appellant because Appellant was a prison inmate would have had to base such a notion on inference, as Miles never testified Appellant was an inmate. Had Defense Counsel objected during the third point testimony, such an objection could have indicated Defense Counsel viewed Miles's testimony as damaging, thereby possibly strengthening a suspicion that Appellant had been imprisoned.

Mindful that a lawyer renders ineffective assistance only where he (or she) fails to exercise the customary skill and diligence that a reasonably competent lawyer would have exercised under similar circumstances, *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987), this court holds Appellant's claim of ineffective assistance is meritless.

The motion court's denial of post-conviction relief is affirmed.

PREWITT, P.J., and PARRISH, J., concur.