**Bonnie L. SEGRAVES, Appellant,**

v.

**STATE of Missouri, Respondent.**

No. 22502.

Missouri Court of Appeals,
Southern District,
Division One.

April 23, 1999.

Motion for Rehearing and Transfer to Supreme Court Denied May 17, 1999.

Application to Transfer Denied
June 29, 1999.

Raymund J. Capelovitch, Asst. Public Defender, St. Louis, for Appellant.

Jeremiah (Jay) Nixon, Attorney General, and Anne E. Hawley, Asst. Atty. Gen., Jefferson City, for Respondent.

CROW, Judge.

A jury found Appellant guilty of murder in the second degree and assessed punishment at twelve years' imprisonment. The trial court entered judgment per the verdict. This court affirmed the judgment on direct appeal. *State v. Segraves,* 956 S.W.2d 442 (Mo.App. S.D.1997).

Appellant thereafter commenced an action for post-conviction relief under Rule 29.15.[1] The motion court denied relief after an evidentiary hearing. Appellant brings this appeal from the motion court's judgment.

Appellant's sole point relied on avers she was denied due process of law and a fair trial before an impartial jury "due to juror misconduct." Specifically, Appellant maintains juror Dixie Ross "lied during voir dire." Appellant alleges the two lawyers who represented her in the trial court ("Defense Counsel") learned of juror Ross's deception after trial and before the time for filing a motion for new trial, yet did nothing. Therefore, says Appellant, Defense Counsel rendered ineffective assistance.

Appellant directs this court's attention to the following segment of voir dire:

"[Defense Counsel]: Before you came into this room this morning and the Judge began talking to you, had any of you heard anything about this case? If you heard anything about the case before you got in your seats in here this morning, please raise your hand.

. . . .

Anyone else over here? Ms. Ross.

VENIREPERSON ROSS: I just know what I read in the paper.

[Defense Counsel]: Okay.

VENIREPERSON ROSS: That's all I know.

[Defense Counsel]: Can you—

VENIREPERSON ROSS: And that's been some time ago, so I couldn't be sure that I could remember details anyway from that. I think I could put it out of my mind.

. . . .

[Defense Counsel]: Last question: Is there anything that Judge Sharp, [the prosecutor] or I have not touched on that causes any of you concern about whether or not you could sit in one of these chairs as a fair and impartial juror? Search your minds. Anything that we haven't asked that you thought we probably should or that you think is important from the standpoint of whether or not you could be a good, fair and impartial juror?"

Venire member Ross made no response to the last question. Neither side challenged Ross[2] for cause or peremptorily, hence she served on the jury.

As recounted in this court's earlier opinion, the victim was a four-month-old child. 956 S.W.2d at 443. The State's evidence showed the victim was "manually strangled" to death. *Id.* at 444. The homicide occurred in Dunklin County; Appellant was tried there.

As explained more fully later in this opinion, Defense Counsel engaged an investigator to interview the jurors after Appellant's trial. The investigator interviewed Ross and thereafter submitted a report to Defense Counsel prior to the deadline for Appellant's motion for new trial. Defense Counsel filed a timely new trial motion; it did not mention Ross.

Appellant's pro se motion for post-conviction relief averred, *inter alia,* that Ross told the investigator she saw the autopsy report prior to trial and felt it was horrifying. Furthermore, pled the pro se motion, Ross told the investigator that the autopsy report left little doubt that Appellant was guilty.

The lawyer appointed to represent Appellant in the motion court ("Motion Counsel") called Ross as a witness at the evidentiary hearing. Ross testified she retired after working over forty years as a deputy county clerk in Dunklin County. Enumerating her duties, Ross said she

---

1. Appellant filed her pro se motion December 29, 1997. Consequently, references to Rule 29.15 in this opinion are to Missouri Rules Criminal Procedure (1997).

2. For brevity, this opinion henceforth refers to venire member Ross by her surname alone. No disrespect is intended.

"took care of all the county's bills" and did some "filing." Ross's testimony continued:

> "Q. Would some of those filings include autopsy reports?
>
> A. They would in a sense, yes.
>
> Q. What do you mean in a sense?
>
> A. Well, all I had to do was just file it, stamp it filed and make a note to pay the cost of the autopsy."

Motion Counsel handed Ross a seven-page document marked "Movant's Exhibit # 1." Ross identified the first page of the exhibit as "a cover sheet for an autopsy report." A copy of the "cover sheet" is attached at the end of this opinion.

Ross testified—and the "cover sheet" confirms—that Exhibit 1 was filed with the County Clerk of Dunklin County on January 23, 1995, some twenty months before Appellant's trial.[3] The "cover sheet" displays, *inter alia*, the victim's name, date of birth and date of death. It also shows:

> "MANNER OF DEATH: Homicide
>
> CAUSE OF DEATH: Manual Strangulation"

The "cover sheet" is signed by Michael D. Zaricor, a pathologist who testified at Appellant's trial. 956 S.W.2d at 444.

Ross acknowledged that after Appellant's trial she talked to a man who "said he was working for [Defense Counsel]." Then, this:

> "Q. Do you recall telling that investigator that you had read the autopsy report prior to trial?
>
> A. No, I did not.
>
> Q. You don't recall, or you did not tell him that?
>
> A. I didn't tell him that.
>
> . . . .
>
> Q. Do you recall telling that investigator that you found the report, quote, very horrifying, unquote?

> A. No. I didn't tell him that, because I didn't read the report at all.
>
> Q. Do you also recall telling him that you felt it left little doubt that Mrs. Segraves was guilty?
>
> A. No, I did not say that.
>
> Q. Do you also recall talking to someone who represented himself as an investigator from my office?
>
> A. I talked to someone. I can't remember his name.
>
> Q. Okay. If I told you his name was Lawndale Thomas, would that ring a bell for you?
>
> A. The Lawndale sounds familiar, but I couldn't be sure.
>
> Q. It was in, roughly, March of this year [4]; is that correct?
>
> A. It was this year. I don't know about the date.
>
> Q. Do you recall telling Mr. Thomas you read the first page of the autopsy report?
>
> A. I told him I saw the cover sheet, because that's what I had to have in order to pay the bill. I had to be sure—The Commission required that that bill be filed before it was paid, and I had to be sure that the autopsy report was filed.
>
> Q. Okay. But you don't recall telling him that you had actually read the first page of the report?
>
> A. I told him that I saw it, but I did not read it.
>
> . . . .
>
> Q. Just for clarification's sake to make sure that we're all clear, you never read the autopsy report, did you?
>
> A. No, I did not.
>
> Q. And you never told anybody that you read it?
>
> A. No, I did not.
>
> Q. ... did [the investigator engaged by Defense Counsel] ever ask you about the autopsy report?

---

3. Appellant's trial began October 10, 1996.

4. 1998.

A. I don't recall him asking me that at all.

Q. Okay. But you told Mr. Thomas that you had seen the front page, and that was all?

A. That's right. That's right."

Motion Counsel presented James Brian Wilburn as a witness in the motion court. Wilburn, a private investigator, testified Defense Counsel engaged him to interview the jurors after Appellant's trial. One of the jurors he contacted was Ross. Wilburn's testimony:

"Q. In the course of that conversation, did [Ross] tell you that she had read the autopsy report prior to trial?

. . . .

A. Yes, ma'am, she did.

Q. Did she tell you that herself, in her own words?

A. Yes, she did.

Q. Did she also describe it as, quote, very horrifying?

. . . .

[A.] Yes, she did.

. . . .

Q. Did she also tell you that to read the report, quote, you would have little doubt that she did it, unquote?

A. Yes, ma'am. That's what she told me.

. . . .

Q. ... You had mentioned that you were at her residence. So this interview was in person?

A. Yes.

Q. She let you into her house?

A. Yes.

. . . .

Q. ... she sat down and talked with you?

A. Yes, ma'am.

Q. And she answered your questions?

A. Yes, ma'am.

. . . .

Q. What other information did she give you other than the answers to the questions?

. . . .

[A.] She told me that she worked for— She described the process, how she came to read the autopsy report. She had told me that she worked for one of the offices, the court [sic] clerk office or something here in the courthouse; and that when the coroner brought it back, it was her job, I believe she said if I remember correctly, to file the report or put—and build a case file or something along those lines, and she had the opportunity to look at it at that time.

. . . .

Q. ... she told you specifically that she had read the report; is that correct?

A. Yes, ma'am.

Q. Did you know Mrs. Ross personally?

A. No, ma'am.

Q. Did you know anything about her?

A. No, ma'am. That was the first time I'd ever met her.

. . . .

Q. ... When you were talking to Mrs. Ross, what was her demeanor with you?

A. Tentative.

Q. What do you mean by tentative? Could you explain that?

A. Uncomfortable, like I was—it was an imposition. I'd say probably just tentative in answering the questions, and then uncomfortable with my presence there.

Q. Okay. But, nonetheless, the [sic] did let you into her home; is that correct?

A. Yes.

Q. And answered your questions?

A. Yes.

Q. Was she cooperative with you?

A. Yes."

During the prosecutor's cross-examination of Wilburn, this dialogue occurred:

"Q. Mr. Wilburn, isn't it a fact that you went to her home and spoke to her husband and she wasn't present at the time, and that you then subsequently spoke to her by telephone?

A. I believe that would be correct, yes, sir."

Motion Counsel also presented Lawndale Lamont Thomas as a witness in the motion court. Thomas, while working as an investigator for Motion Counsel's office, contacted Ross by telephone on or about March 13, 1998.[5] Thomas's testimony:

"Q. .... In the course of that interview, did Mrs. Ross tell you that she'd read the autopsy report?

A. Yes.

Q. Did she tell you she read the whole report?

A. No.

Q. Okay. What did she tell you she read?

A. She told me she read the cover of the autopsy report.

. . . .

Q. ... in your notes here you say she said that she did see the autopsy report before trial, and she only read the cover page of the autopsy report, didn't read any other page of the report; and that she read the top page—the reason she read the top page was to find out who the report was about. Is that correct?

A. Correct."

Defense Counsel—both of them—were also presented by Motion Counsel as witnesses in the motion court. Both testified (on cross-examination by the prosecutor) that they knew Ross and she had a reputation as a truthful person.

The grounds for relief pled by Appellant in the motion court included, *inter alia,* grounds designated "8a1" and "8b1," respectively. They read:

"The Court must vacate Ms. Segraves' conviction and grant her a new trial due to juror misconduct. Juror Dixie Ross failed to tell the Court she read the autopsy report prior to trial.

[Defense Counsel were] ineffective for failing to include in the motion for new trial an allegation of juror misconduct, or otherwise bring to the court's attention the fact Dixie Ross read the autopsy report prior to trial, and neglected to inform the parties of this fact during voir dire."

The motion court considered those two grounds together and rejected them, declaring:

"This court finds that movant did not prove by a preponderance of the evidence that Dixie Ross had read the autopsy report before the trial, and accepts her testimony as being true. Because of this finding there is no factual basis for these claims [8a1 and 8b1]. Therefore, movant is not entitled to relief on the claims."

■ This court's review of the motion court's judgment is limited to a determination of whether the findings and conclusions of that court are clearly erroneous. Rule 29.15(k); *State v. Phillips,* 940 S.W.2d 512, 521[14] (Mo. banc 1997). Such findings and conclusions are clearly erroneous only if, after review of the entire record, this court is left with the definite and firm impression that a mistake has been made. *Leisure v. State,* 828 S.W.2d 872, 874 (Mo. banc 1992), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992).

■ In applying the above standard, this court is mindful that (1) the burden was on Appellant to prove her claim for relief by a preponderance of the evidence, Rule 29.15(i); *State v. Stepter,* 794 S.W.2d 649, 657 (Mo. banc 1990), and (2) credibility of the witnesses was for the motion court's determination. *State v. Kelley,* 953

---

5. That date was more than sixteen months after Wilburn contacted Ross.

S.W.2d 73, 93[51] (Mo.App. S.D.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998); *State v. Martineau*, 932 S.W.2d 829, 834[7] (Mo.App. S.D.1996).

 Endeavoring to prevail in this court despite the limitations on this court's review, Appellant argues: "This court cannot hide behind the cloak of the motion court's credibility determination, because the evidence in this case clearly showed Ms. Ross lied to the [trial] court during voir dire." In support of that contention, Appellant asserts: "Ms. Ross told two people that she read the autopsy report prior to trial."

That assertion is an egregious misstatement of the record. Only Wilburn testified that Ross said she read the autopsy report. Thomas testified unequivocally that Ross said she read only the cover of the autopsy report, nothing else.[6] Thomas's testimony was consistent with Ross's account of her conversation with him and inconsistent with Wilburn's testimony.

Furthermore, the record amply supports the motion court's conclusion that Ross's testimony was true. As reported earlier, Defense Counsel—each separately—testified Ross had a reputation as a truthful person.

Additionally, at least two aspects of Wilburn's testimony could have impaired his credibility with the motion court. First, Wilburn testified on direct examination that he talked to Ross in person at her home; yet, on cross-examination he testified she was gone when he went to her home and he subsequently spoke to her by telephone. Second, Wilburn quoted Ross as saying it was her job to "build a case file." The motion court could have reason-ably concluded it was unlikely that Ross's duties as a deputy county clerk included building a case file in a criminal case.

Despite Appellant's strenuous argument, this appeal amounts to nothing more than an effort to induce this court to override the motion court's determination that Ross was credible (and, *ergo*, Wilburn was not). For the reasons set forth above, this court holds the motion court did not clearly err in resolving the credibility issue in favor of Ross and against Wilburn. Accordingly, this court accepts the motion court's finding that Appellant failed to prove by a preponderance of the evidence that Ross read the autopsy report before Appellant's trial.[7]

Appellant's claim of ineffective assistance of counsel hinges on the hypothesis that (a) Ross read the autopsy report before Appellant's trial, (b) Ross falsely denied doing so during voir dire, (c) Defense Counsel learned of Ross's deception before the deadline for Appellant's motion for new trial, and (d) Defense Counsel failed to raise the issue in Appellant's new trial motion.

Inasmuch as the motion court found Appellant failed to prove element "(a)"—a finding this court has upheld—this court holds the motion court did not clearly err in rejecting Appellant's ineffective assistance claim. Defense Counsel cannot be branded ineffective for failing to include in Appellant's motion for new trial a ground that hinged on a factual hypothesis rejected by the motion court in a finding that was not clearly erroneous.

---

6. The cryptic entry on the cover of the autopsy report that the victim's death was a homicide caused by manual strangulation was consistent with the testimony of pathologist Zaricor at Appellant's trial. 956 S.W.2d at 444. Zaricor's meticulous testimony occupies 51 pages of the trial transcript. As this court understands Appellant's brief, Appellant does not claim Ross learned anything from the cover sheet that Zaricor did not explain in detail at trial.

7. Attempting to buttress her claim that Ross was prejudiced against her, Appellant emphasizes that Ross "lost" one of her own children in death—a fact Ross disclosed during voir dire—and that Ross worked in the county clerk's office. Appellant fails to explain how those circumstances demonstrate Ross was biased toward the State, and this court finds nothing in those circumstances compelling any such inference.

Appellant's point relied on is denied and the judgment of the motion court is affirmed.

PREWITT, P.J., and PARRISH, J., concur.